OSCN Found Document:POSEY v. STATE

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 POSEY v. STATE
2024 OK CR 10
Case Number: D-2019-542
Decided: 04/18/2024
DEREK DON POSEY, Appellant v. THE STATE OF OKLAHOMA, Appellee

Cite as: 2024 OK CR 10, __ __

 

 

O P I N I O N

ROWLAND, PRESIDING JUDGE:

¶1 Appellant Derek Don Posey appeals his Judgment and Sentence from the District Court of Canadian County, Case No. CF-2013-463, for his First Degree Murder convictions and death sentences for the deaths of Amy Gibbins (Counts 1 and/or 2) and her son, Bryor Gibbins (Counts 3 and/or 4), in violation of 21 O.S.Supp.2012, § 701.7.[1] Posey's jury fixed punishment at death for both murder convictions after finding the same three aggravating circumstances as to each victim, namely: (1) that Posey knowingly created a great risk of death to more than one person;[2] (2) that the murders were especially heinous, atrocious, or cruel;[3] and (3) that there existed a probability that Posey would commit criminal acts of violence that would constitute a continuing threat to society.[4] The Honorable Bob W. Hughey, Associate District Judge, presided over Posey's jury trial and sentenced him to death for each murder pursuant to the jury's verdicts, with all sentences to be served concurrently.[5] Posey raises eleven claims for review; however, no claim warrants relief. We affirm Posey's Judgment and Sentence.

BACKGROUND

¶2 Amy Gibbins and her young son, Bryor, were murdered in their Calumet, Oklahoma home around 4:00 a.m. on Father's Day 2013.[6] Amy died from blunt force head trauma and Bryor died from smoke inhalation and thermal burns from the fire started by the killer to cover up the crime scene.[7]

¶3 Posey became the prime suspect early in the investigation after an employee at Amy's bank notified law enforcement about a series of transactions on her debit card after her death. These transactions occurred at 4:35 a.m. and 4:37 a.m. at an ATM in nearby El Reno while Amy's house was ablaze. The bank captured video from the ATM showing Posey using Amy's debit card. Posey tried to shield his face with a towel, but ultimately abandoned the towel to complete his transactions. Police recovered the towel and transaction slips in a field. Posey admitted using the debit card during a police interview, but his explanation for his possession of the debit card was refuted.[8]

¶4 An investigator showed the ATM photographs to Amy's sister, Dera King, and she identified Posey. She said she knew him from a local club and family restaurant in Calumet. Investigators learned that Posey worked on an oil rig two miles south of Calumet and stayed in a company trailer outside of town. They also learned that he had previously been to the bar directly across the alley from Amy's house and that he had prior encounters with her and her sister.

¶5 A witness, who lived across from the company trailer, testified she saw two males, one white and one black, arrive in a truck and go inside the company trailer on June 16 around 3:00 a.m. Fifteen to twenty minutes later, the white male got in the truck and headed toward El Reno. Some thirty minutes later, around 3:30 to 3:45 a.m., the black male exited the trailer, got in a different, dark-colored truck, and headed toward Calumet. She noticed he had his jeans tucked in his boots and was muttering to himself. This witness had seen Posey and his co-workers at the restaurant where she worked a couple of weeks before the murders. She claimed they were rowdy and said loud and inappropriate things about Amy's sister, who was sitting at the cash register. Although all the workers joined in, Posey was the most vocal and made most of the derogatory statements, including that he knew Amy and her sister from the bar, and they were nothing but "little bitches."

¶6 Amy's sister described an incident where she and Amy were at the bar near Amy's house and Posey and a friend introduced themselves. Posey called himself the "Black Cowboy" and wore his pants tucked inside his cowboy boots. When Amy set her drink down, Posey picked it up and took a drink, irritating Amy. He sent Amy's sister a Facebook message a few days later that read "ha ha late night drunk text lol." On another occasion at the bar, Posey told Amy's sister, "y'all think you're hot shit" and "you and your sister think you're the baddest bitches in town."

¶7 A criminalist with the Oklahoma State Bureau of Investigation's biology unit conducted DNA testing on the vaginal and anal swabs taken from Amy's body during autopsy.[9] She first performed traditional DNA analysis on the vaginal swab and obtained both an epithelial and sperm fraction with the same female profile, both of which matched Amy.[10] A comparison with Posey, Amy's current boyfriend, her ex-boyfriend, and her ex-husband yielded no matches as all were excluded. The criminalist then performed Y-STR DNA testing on the vaginal swab which identifies only male DNA and compared the same men's profiles.[11] Posey's DNA profile matched the Y-STR profile from both the epithelial and sperm fractions at all sixteen points analyzed while all the other men were excluded. Because Y-STR testing is male specific, the results would include not only Posey, but also all his male blood relatives. The database used in Y-STR analysis calculated this profile would appear in African American men 1 in 4,301 times.

¶8 Posey denied any physical relationship with Amy in his police interview and denied ever going to her home. He maintained his innocence at trial and presented evidence of an alternate suspect as the likely perpetrator, namely Amy's former boyfriend, Brady Almaguer. He further challenged the adequacy of the criminal investigation. Other facts will be discussed in relation to the claims raised for review.

1. DOUBLE JEOPARDY

¶9 The State charged Posey with four counts related to the murders of Amy and her son, alleging alternative theories for each victim. Count 1 alleged Posey murdered Amy with malice aforethought while Count 2 alleged he murdered her during the commission of forcible rape. Count 3 alleged Posey murdered Bryor during the commission of arson while Count 4 alleged he murdered the child during the commission of murdering the child's mother. The district court instructed on the elements of each of the four counts. It further instructed, over objection, that when a crime is charged in the alternative with more than one "underlying factual theory," the jury need not be unanimous concerning the underlying theory but only as to the finding of guilt.[12] The district court submitted one general verdict form for Counts 1 and 2 and one for Counts 3 and 4. Each of the two verdict forms gave the jury the option only to find Posey guilty or not guilty without any delineation of the theory which served as the basis for the verdict.[13] Hence, the record does not reveal the underlying basis of Posey's murder convictions for either Amy or her son.

¶10 Posey argues his convictions on alternative Counts 1 and 2 for Amy's death and Count 4 for Bryor's death violate the prohibition against double jeopardy and the felony murder merger doctrine. See Jones v. State, 1995 OK CR 34, ¶ 61, 899 P.2d 635, 650 ("Under the doctrine of merger, the State is prohibited from prosecuting a person for felony murder and the predicate felony.") He maintains his murder conviction for Amy's death in Counts 1 and/or 2 is the predicate felony for the felony murder charged in Count 4, i.e., that Bryor's death occurred during the commission of the murder of his mother. He maintains Counts 1 and/or 2 must be dismissed because they merge into Count 4. See Lambert v. State, 1999 OK CR 17, ¶ 14, 984 P.2d 221, 229 (per curiam) (holding proper resolution of double punishment problem is to vacate the convictions and sentences for the underlying felonies). We disagree.

¶11 We begin by observing that Posey raised no double jeopardy objection at trial. Our review therefore is for plain error only. See Frazier v. State, 2020 OK CR 7, ¶ 8, 470 P.3d 296, 302. Plain error review "provides a very limited avenue of appellate review." Barnett v. State, 2012 OK CR 2, ¶ 3, 271 P.3d 80, 82. To obtain relief, Posey must show that a plain, obvious error affected his substantial rights, and we must find that without correction, the error would seriously affect the fairness, integrity, or public reputation of the judicial proceedings or constitute a miscarriage of justice. Frazier, 2020 OK CR 7, ¶ 8, 470 P.3d at 302. 

¶12 It is well settled that the Double Jeopardy Clause prohibits "multiple punishments for the same offense." Mack v. State, 2008 OK CR 23, ¶ 4, 188 P.3d 1284, 1287; see also U.S. Const. amends V, XIV; Okla. Const. art. II, § 21.[14] And, we have stated that the Double Jeopardy Clause protects a defendant from being convicted of both felony murder and the underlying felony. See Jones, 1995 OK CR 34, ¶ 61, 899 P.2d at 650 (stating State is prohibited from prosecuting a person for felony murder and the predicate felony); Perry v. State, 1988 OK CR 252, ¶ 22, 764 P.2d 892, 898 ("It is abundantly clear that a defendant cannot be convicted of both felony-murder and the underlying felony."). This rule, however, presumes one victim is the subject of both the murder and predicate felony. Thus, conviction for both the victim's murder and predicate felony results in double punishment because the elements of the predicate felony are also included in the elements of the felony murder conviction of that victim. The defendant in that instance is punished twice for the predicate felony.

¶13 The State argues that there is no double jeopardy multiple punishment problem here because there were two murder victims and Posey is being punished for separate and distinct criminal acts rather than one. Thus, the State contends this is not a situation that triggers the felony murder merger rule. It cites the reasoning in State v. Elliott, 412 S.E.2d 762, 766-67 (W.Va. 1991), which held that "where there is more than one underlying felony supporting a felony murder conviction and one of the underlying felonies is committed upon a separate and distinct victim from the victim who was actually murdered, that underlying felony conviction does not merge with the felony murder conviction for the purposes of double jeopardy." Id. See also Stitt v. State, 256 Ga. 155, 156, 345 S.E.2d 578, 580 (1986) (holding where there is a single victim the defendant may not be convicted of both the underlying felony and felony murder, but this rule does not apply where there are separate victims).

¶14 According to Posey, however, the "question is not the number of victims, but the elements of the crime." He contends that the State's reliance on Elliott is not binding, and that the merger rule governs his case because the elements in Counts 1 and/or 2 were included in Count 4. We disagree. Principles of fairness and justice dictate that we not resolve this claim without consideration of the number of victims lest a defendant in that situation goes unpunished for murdering one of his or her two victims. It is obvious to any casual observer that Posey is not being punished twice for Amy's murder in this case, but rather for the two distinct murders he committed.

¶15 Oklahoma generally applies the Blockburger test to evaluate constitutional double jeopardy claims.[15] Logsdon v. State, 2010 OK CR 7, ¶ 19, 231 P.3d 1156, 1165. "Under the Blockburger test, this Court asks whether each offense requires proof of an additional fact that the other does not." Id. While the elements of Counts 1 and 2 are technically included in Count 4, see Proposition 7, infra, the criminal conduct being punished is not the same and this was made abundantly clear by the jury instructions.[16] The first element is the death of a human and that element corresponded to Amy in Counts 1 and 2, the alleged victim in those charges, and to Bryor in Count 4.[17] The jury found Posey murdered Amy in Counts 1 and/or 2 either with malice aforethought or during the commission of rape.[18] Yet in Count 4 the jury found Posey murdered Bryor during the commission of the murder of his mother. The elements of Counts 1 and/or 2--that Posey murdered Amy--were included in Count 4 but nevertheless that crime was distinctly different and required proof of at least one different fact, i.e., the death of Bryor.

¶16 When we compare the alternative crimes in Counts 1 and 2 and in Count 4, it is evident they are not part of a single crime which requires application of the merger rule. See Davis v. State, 1999 OK CR 48, ¶¶ 4-5, 993 P.2d 124, 125 (holding offenses requiring different elements of proof are not the same for purposes of the double jeopardy proscriptions). Murder committed against separate victims in this situation necessarily creates an exception to the general felony murder merger rule. And, equally important, there is legislative intent to provide for two punishments in this instance. "[T]he Blockburger test is a rule of statutory construction that does not apply '[w]here, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under Blockburger[.]'" Knapper v. State, 2020 OK CR 16, ¶ 93, 473 P.3d 1053, 1081 (quoting Missouri v. Hunter, 459 U.S. 359, 368 (1983)). Here, by including in the felony murder statute the predicate felony of murder committed during the murder of another, the Legislature recognized that one murder may result from the commission of another and made clear its intent to authorize punishments for both the original murder under the applicable statute and the second murder of another that occurred during it. See Id. 2020 OK CR 16, ¶ 94, 473 P.3d at 1081 (observing legislatures, not courts, prescribe punishment for crimes).

¶17 For these reasons, we find Posey's murder convictions on Counts 1 and/or 2 and 4, which are authorized by the plain language of the first degree murder statute and supported by overwhelming evidence, do not violate either the federal or state prohibition against multiple punishment or require any application of the felony murder merger rule. Accordingly, there is no error and thus no plain error. This proposition is denied.

2. OTHER CRIMES EVIDENCE

¶18 Posey argues propensity evidence of a prior sexual assault, for which he was tried, but not convicted, should have been excluded from his trial. He acknowledges that the United States Supreme Court has upheld the use of acquitted conduct in subsequent proceedings in Dowling v. United States, 493 U.S. 342 (1990). Posey submits, however, that the final disposition of his prior sexual assault case was a final disposition of an ultimate issue in the case and ought to operate as a bar to use in any subsequent proceeding. He urges this Court to "follow the lead of other courts around the nation and expressly prohibit the use of a prior bad act which resulted in an acquittal."

¶19 The State filed pre-trial notice of its intent to admit the testimony of M.K.M., the alleged victim of the prior sexual assault, under either the common scheme or plan or the identity exceptions to the prohibition of other crimes and bad acts evidence outlined in 12 O.S.2011, § 2404(B) or the exception for admission of sexual propensity evidence under 12 O.S.2011, § 2413. Posey filed written objections and the district court held hearings on the admissibility of the evidence. According to defense counsel, the State previously charged Posey with First Degree Burglary, Rape by Instrumentation, and Sexual Battery and a jury acquitted him of the burglary and sexual battery. Because the jury reached no verdict on the rape by instrumentation charge, that charge was later dismissed with prejudice. The district court concluded the propensity evidence was admissible under 12 O.S.2011, § 2413 and admitted the evidence over Posey's repeated objections. We review a district court's ruling admitting sexual propensity evidence for an abuse of discretion. Perez v. State, 2023 OK CR 1, ¶ 3, 525 P.3d 46, 48. We will find an abuse of discretion only where the ruling is unreasonable or arbitrary and made without proper consideration of the facts and law pertaining to the matter at issue. Id.; Neloms v. State, 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170.

¶20 Posey first contends the factors this Court outlined in Horn v. State, 2009 OK CR 7, ¶ 40, 204 P.3d 777, 786 for the admissibility of propensity evidence weighed in favor of excluding the challenged evidence. In Horn, we instructed trial courts to consider the following factors in deciding whether to admit sexual propensity evidence: "1) how clearly the prior act has been proved;[19] 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence."[20] Id. (footnote added). "Horn instructs the trial court, when considering the dangers posed by the admission of propensity evidence, to consider: '1) how likely is it such evidence will contribute to an improperly-based jury verdict; and 2) the extent to which such evidence will distract the jury from the central issues of the trial.'" Perez, 2023 OK CR 1, ¶ 4, 525 P.3d at 48 (quoting Horn, 2009 OK CR 7, ¶ 40, 204 P.3d at 786).

¶21 Posey claims the prior charges related to M.K.M. were not sufficiently proven by clear and convincing evidence under Horn because he was acquitted of the burglary and sexual battery charges and the trial court dismissed with prejudice the remaining charge. He maintains the only way to reconcile the verdicts and evidence is to surmise that some evidence in the prior trial suggested a consensual encounter considering M.K.M.'s identification and DNA consistent with his profile being collected at the scene. Posey also maintains that the challenged evidence had little probative value and was extremely prejudicial.

¶22 Evidence is relevant when it has "any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Postelle v. State, 2011 OK CR 30, ¶ 31, 267 P.3d 114, 131. It need not establish the defendant's guilt directly or conclusively; it need only, when taken with other evidence in the case, tend to establish a material fact. Id. "When measuring the relevancy of evidence against its prejudicial effect, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." Bever v. State, 2020 OK CR 13, ¶ 74, 467 P.3d 693, 707. This Court employs the presumption that trial courts should lean in favor of admission. Mayes v. State, 1994 OK CR 44, ¶ 77, 887 P.2d 1288, 1309-10. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice [or] confusion of the issues . . . ." Postelle, 2011 OK CR 30, ¶ 31, 267 P.3d at 131.

¶23 The district court found the testimony of the investigators and the victim, M.K.M., about the break-in, beating, and rape in the prior case probative and necessary to support the State's burden of proof in the instant case. M.K.M. identified Posey as her nighttime attacker which was corroborated by DNA consistent with his profile being collected from carpet in her apartment. Posey denied murdering Amy or ever being in her home. He contended that Amy's ex-boyfriend was the perpetrator. Testimony concerning the prior break-in and sexual assault demonstrated his propensity to break into and attack single women in their homes in the nighttime and to beat them about the head and sexually assault them while the women were face down. This evidence was relevant to prove whether Posey was Amy's rapist and killer, as charged in the present case. The testimony of M.K.M. and the investigators tended to show that Posey was lying about his involvement in Amy's death, thus refuting his claim of innocence and alternative suspect defense. Even though Posey was acquitted of the crimes, we find there was no less prejudicial evidence the State could have used to meet its burden in this regard. We are unconvinced on this record that the State's evidence was insufficient under Horn to prove, by clear and convincing evidence, the prior sexual assault of M.K.M. because of Posey's acquittal.

¶24 There is no question this evidence was prejudicial to Posey at trial. "The real question, however, is whether it is unfairly so." James v. State, 2009 OK CR 8, ¶ 10, 204 P.3d 793, 797 (citing 12 O.S.2001, § 2403). We find the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. 12 O.S.2011, § 2403. The sexual propensity evidence provided important insight into Posey's motive and capacity to commit these crimes. And this is simply not a case where the sexual propensity evidence had the potential to contribute to an improperly based jury verdict, in large part, because of the court's instructions concerning the propensity evidence. Prior to M.K.M.'s testimony, the district court read the uniform instruction on the use of sexual propensity evidence to the jury. See Instruction No. 9-10A OUJI-CR (2d) (Supp. 2010).[21] The court instructed the jury that it could not convict Posey solely because of a belief he tended to engage in acts of sexual assault and that the State had the burden to prove each element of the charged offenses beyond a reasonable doubt. The court also included the former charges against Posey and the outcome of those charges in its instruction, i.e., acquittal or dismissal. Instruction No. 17 in the written jury charge repeated the previous, oral instructions for this evidence. These limiting instructions reduced the possibility of a verdict based upon impermissible grounds. See Pullen v. State, 2016 OK CR 18, ¶ 8, 387 P.3d 922, 926 (observing submission of uniform instruction emphasizing limited nature and use of propensity evidence favors admissibility). The uniform instruction is designed to reduce, if not eliminate, the likelihood of an improper verdict based upon admission of propensity evidence. The district court's instruction further lessened the prejudicial impact of the propensity evidence by informing the jury that Posey had been acquitted of two of the three charges and the third had been dismissed. We presume the jurors followed these instructions and find no evidence to the contrary. See Williams v. State, 2021 OK CR 19, ¶ 7, 496 P.3d 621, 624 (presuming jury followed limiting instruction concerning propensity evidence).

¶25 Posey also argues the evidence should have been excluded because his acquittal verdict and the dismissal with prejudice of the rape by instrumentation charge were final dispositions of ultimate issues. He maintains Dowling bars the use of prior acquitted conduct in that instance. In Dowling, the Supreme Court held neither the Double Jeopardy Clause nor the Due Process Clause barred testimony concerning a crime a defendant had previously been acquitted of committing. Dowling, 493 U.S. at 348-50, 352-54. Dowling appealed his conviction for bank robbery and challenged the Government's admission of evidence under Rule 404(b) of the Federal Rules of Evidence that he had previously broken into a home, attempted to rob, and assaulted the homeowner. The district court instructed the jury that Dowling had been acquitted of the charges and emphasized the limited purpose of the evidence both at the time the homeowner testified and in the final charge to the jury.

¶26 The Court observed that under the doctrine of collateral estoppel "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot be litigated between the same parties in any future lawsuit." Dowling, 493 U.S. at 347 (quoting Ashe v. Swenson, 397 U.S. 436, 443 (1970)). The Court accepted that Dowling's acquittal established reasonable doubt as to whether he was one of the intruders. Id. 493 U.S. at 348. It observed, however, that the government at the bank robbery trial did not have to prove Dowling was one of the intruders beyond a reasonable doubt; it had to show for admission under Rule 404(b) only that the jury could "reasonably conclude" that Dowling was an actor involved in the home invasion. Id. 493 U.S. at 348-49. The Court found no violation of the collateral estoppel component of the Double Jeopardy Clause because of the lower burden of proof required for Rule 404(b) evidence, noting a "jury might reasonably conclude that Dowling was the masked man who entered [the] home even if it did not believe beyond a reasonable doubt that Dowling committed the crimes charged . . . ." Id. Accordingly, the Court held that an acquittal verdict in a criminal case does not preclude the government from relitigating an issue when it is presented in a subsequent case with a lower burden of proof. Id. 

¶27 Despite this holding, the Court also addressed Dowling's burden of proof, finding he had not sufficiently demonstrated that his acquittal in his first trial represented a jury determination that he was not one of the intruders.[22] Id. 493 U.S. at 350. The burden is on the defendant to "demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." Id. The Dowling Court repeated its finding from Ashe that courts must examine the entire record on an acquitted charge based upon a general verdict and decide whether a rational jury could have grounded its verdict on an issue other than that which the defendant seeks to foreclose from consideration. Id. The Court observed that the record concerning the charges resulting in Dowling's acquittal was sparse and consisted of a discussion between the parties and the trial court. Id. 493 U.S. at 351. Neither the trial court nor the Supreme Court found that Dowling had been acquitted on the issue of identification. Dowling defended the home invasion case, arguing that no robbery was committed and that he and another man were present to collect a debt. The Supreme Court found there were "any number of possible explanations for the jury's acquittal verdict" and that nothing in the record persuasively indicated that the question of identity was at issue and was determined in Dowling's favor. Id. 493 U.S. at 352. Because Dowling failed to satisfy his burden of demonstrating that the jury concluded he was not one of the intruders in the home invasion, the Court found Dowling would not be entitled to relief even if the Court were inclined to apply the Double Jeopardy Clause. Id. 

¶28 Based on the holding in Dowling, we find the district court did not err in admitting evidence related to the charges Posey was acquitted of committing or that were dismissed. The burden of proof for admission of the challenged propensity evidence under Section 2413 (clear and convincing) was lower than the beyond a reasonable doubt burden utilized in his prior criminal trial on the charges related to M.K.M. Under Dowling, an acquittal in a criminal case does not preclude the government from relitigating an issue in a subsequent case with a lower burden of proof. Id. 493 U.S. at 348-49.

¶29 Nor are we convinced that Posey met his burden of proof to show the issue he seeks to foreclose was decided in his favor in the prior trial. As in Dowling, the record concerning his acquittal is sparse.[23] It appears identity was not seriously disputed based upon DNA consistent with Posey's DNA profile at the scene, M.K.M.'s identification, and Posey's police interview admission that he had a consensual encounter with an Asian female.[24] Posey insists, however, that the jury must have acquitted him based upon a finding that no crimes were committed because of consent. Given the sparseness of the record of the prior trial, we are hard pressed to find Posey has met his burden of proof. All things considered, a rational jury in the prior trial might reasonably have concluded that Posey was the man who entered M.K.M.'s home but grounded its verdict of acquittal based upon a finding that the State simply did not meet its demanding and highest burden of proof that he committed the charged crimes rather than that no crimes were committed because of consent. Posey simply has not shown on this record that he was deprived of a fundamentally fair trial in violation of due process by admission of the challenged propensity evidence, especially considering the limiting instructions issued in this case. Id. 493 U.S. at 352-54. Accordingly, we find the district court did not abuse its discretion in admitting the challenged propensity evidence. This claim is denied.

3. MATERIAL WITNESS

¶30 Posey claims the State unlawfully secured a material witness warrant for a rape victim and forced her to testify against him in violation of 22 O.S.2011, § 720(A).[25] The State called T.W. in the penalty phase to testify that Posey raped her in 2012 to support the continuing threat aggravating circumstance. On cross-examination she explained that she had been arrested on a material witness warrant and detained for two days before being released on the condition that she would cooperate and make weekly contact with the prosecution's witness coordinator.[26]

¶31 Posey argues T.W.'s status as a crime victim exempted her from the reach of a material witness warrant and thus the State could not lawfully secure her attendance and present her testimony with its use. According to Posey, the district court should have excluded T.W.'s illegally coerced testimony against him. He insists admission of her testimony violated his rights to fundamental fairness and a reliable sentencing proceeding in violation of the Eighth and Fourteenth Amendments. He further insists that the error is not harmless because her testimony tended to show a likelihood of future misconduct. Based upon this alleged error, he asks us to vacate his death sentences. Because Posey failed to contemporaneously object to T.W.'s testimony, our review of this claim is for plain error only.

¶32 The State frames this issue as one of standing and maintains Posey lacks standing to enforce T.W.'s rights as an alleged crime victim based upon the crime victim exception in Section 720(A). Posey counters that he has standing because he is asserting his own constitutional rights to fundamental fairness and a reliable sentencing hearing.

¶33 We observe that Posey does not cite any authority from this--or any other--Court to show that the rights established in § 720 are rights held by the accused. In Powers v. Ohio, 499 U.S. 400 (1991), the Supreme Court considered whether a criminal defendant had standing to raise the equal protection rights of a prospective juror excluded from service on account of race. The Court stated:

In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties. This fundamental restriction on our authority admits of certain, limited exceptions. We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute, the litigant must have a close relation to the third party, and there must exist some hindrance to the third party's ability to protect his or her own interests. These criteria have been satisfied in cases where we have permitted criminal defendants to challenge their convictions by raising the rights of third parties. By similar reasoning, we have permitted litigants to raise third-party rights in order to prevent possible future prosecution.

Id. 499 U.S. at 410-11 (citations omitted).

¶34 We have considered the issue of standing to challenge material witness proceedings in an unpublished decision and found the defendant in that case had no standing. Boyd v. State, Case No. F-2013-633 (unpublished) (July 30, 2014). We further observe a New York court considering whether a defendant had standing to challenge material witness proceedings found it is the witness and not the defendant who possesses all the rights. See People v. Davis, 163 A.D.2d 826, 558 N.Y.S.2d 358 (1990) (holding defendant lacked standing to challenge propriety of material witness proceedings).

¶35 In the absence of any contrary authority, we find that Posey has no standing to challenge T.W.'s material witness proceeding, a proceeding involving a third party, as the rights outlined in Section 720 belong to her rather than Posey. His case does not fall within the exception to the rule which would allow a litigant to vindicate the legal rights or interests of a third party. His jury was well aware of the circumstances leading to T.W.'s testimony and could weigh these circumstances in evaluating her testimony and credibility. This claim is therefore denied.

4. JURY SELECTION

¶36 Posey argues the district court committed reversible error when it denied defense counsel's request to remove seven prospective jurors for cause.[27] According to Posey, the district court's denial of his cause challenges forced him to use his discretionary peremptory challenges to remove these panelists and to accept six other objectionable jurors. Posey preserved this issue for appellate review by first using his peremptory challenges to strike the panelists he had unsuccessfully challenged for cause. Next, he requested, without success, additional peremptory challenges, and after that, he made a record of the six other "unacceptable" prospective jurors he would have excused with peremptory challenges had he not been forced to use his on the panelists the district court refused to excuse for cause. See Nolen v. State, 2021 OK CR 5, ¶ 97, 485 P.3d 829, 852-53, cert. denied, 142 S. Ct. 566 (2021) (setting forth prerequisites for preservation of erroneous rulings on for cause challenges).

¶37 We review a district court's decision on whether to disqualify a prospective juror for cause for an abuse of discretion. Nolen, 2021 OK CR 5, ¶ 98, 485 P.3d at 853. As stated previously, we will find an abuse of discretion only where the challenged ruling is a clearly erroneous conclusion and judgment which is contrary to the logic and effect of the facts presented. We find no abuse of discretion in this case.

¶38 Voir dire examination allows the parties to discover whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges. The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985) (internal quotations omitted). See also Tryon v. State, 2018 OK CR 20, ¶ 28, 423 P.3d 617, 630. "Inherent in this determination is that the potential juror has been fully informed of the law and his or her responsibilities under the law and oath of a juror." Eizember v. State, 2007 OK CR 29, ¶ 41, 164 P.3d 208, 221.

¶39 Under Witt, jurors in a capital case must be willing to consider each of the three statutory punishments: the death penalty, life imprisonment without the possibility of parole, and life imprisonment with the possibility of parole. Nolen, 2021 OK CR 5, ¶ 100, 485 P.3d at 853; Tryon, 2018 OK CR 20, ¶ 28, 423 P.3d at 630. We have held that "[d]ue process of law requires that a prospective juror be willing to consider all the penalties provided by law and not be irrevocably committed to a particular punishment before the trial begins." Johnson v. State, 2012 OK CR 5, ¶ 30, 272 P.3d 720, 730 (quoting Sanchez v. State, 2009 OK CR 31, ¶ 44, 223 P.3d 980, 997). Doubts regarding juror impartiality are resolved in favor of the accused. Nolen, 2021 OK CR 5, ¶ 100, 485 P.3d at 853. In our review, we consider the entirety of each potential juror's voir dire examination and give deference to the ruling of the district court because of its personal observation of the panelists and ability to consider non-verbal factors that cannot be observed from a transcript. Id. As the Supreme Court observed, "[d]eference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." Uttecht v. Brown, 551 U.S. 1, 9 (2007); see also Eizember v. Trammell, 803 F.3d 1129, 1135 (10th Cir. 2015) (stating significant deference must be afforded a trial judge's assessment because he or she is best positioned to determine whether a potential juror will be able to follow his or her instructions rather than a court of appeals who is removed from the live proceedings).

¶40 Posey claims that these seven panelists were biased in favor of the death penalty based on their questionnaire responses and oral responses during questioning. He complains several panelists indicated they would not consider a sentence of life under certain circumstances. He zeroes in on specific responses to argue the panelists' bias in favor of the death penalty prevented or substantially impaired their ability to perform their duties as a juror. The State counters that when the panelists' responses are considered in their entirety and in context, each of these panelists was willing to adhere to their oaths, to follow the law provided by the court, and to consider the three punishment options.

¶41 None of the challenged panelists had any philosophical opposition to the death penalty and all but one rated their support for capital punishment between eight to ten on a scale of one to ten.[28] After the court advised the panelists of the three possible punishments for a first-degree murder conviction, each said he or she was willing to consider all three statutory punishments. When the parties probed the panelists' views on the three punishment options, the panelists' responses were, at times, equivocal about their ability to consider life with or without parole. Posey's counsel asked questions designed to test each panelist's willingness to vote for the death penalty and to consider a life sentence for an intentional murder. Counsel asked or attempted to ask two panelists about a particular factual circumstance the panelist indicated warranted a death sentence. Counsel asked the remaining panelists if they could envision a set of facts where they could not consider a life sentence.

¶42 That R.B. and M.S. gave examples on their questionnaires of circumstances they felt merited a death sentence that were present in Posey's case did not make them automatically unfit to serve and removable for cause.[29] See Eizember, 2007 OK CR 29, ¶ 40, 164 P.3d at 221 (stating pre-trial questionnaire cannot trump the actual voir dire). Each said they would consider the three penalty options in this case and follow the law. That the other challenged panelists could envision factual circumstances that, in the panelist's view, would not warrant a life sentence also did not make them unfit to serve. Whether the panelists could envision a set of facts where they would not impose life is not the same inquiry as whether he or she could consider the three punishment options in this case and follow the court's instructions. The panelists during this portion of jury selection were without details concerning the charged crimes against Posey, making it difficult to identify those circumstances where they would or would not consider voting for life with or without parole. The record shows these panelists understood any punishment determination would be made after finding Posey guilty beyond a reasonable doubt and hearing the evidence and weighing the aggravating and mitigating evidence. In the end, these panelists were willing to meaningfully consider the three punishment options and follow the law as provided by the court. Reviewing the panelists' responses in toto with deference to the district court's ruling, we find their responses do not demonstrate an impermissible bias towards the death penalty or an unwillingness to consider a life sentence, individual responses read in isolation notwithstanding. Accordingly, we find the district court did not err in denying Posey's for cause challenges of these panelists. This proposition is denied.

5. JURY SELECTION

¶43 Posey claims the district court also committed reversible error by excusing for cause, over his objection, four panelists based on their purported inability to consider the death penalty as a sentencing option. According to Posey, S.C., S.Y., C.B., and C.H. each indicated she could consider the death penalty as a sentencing option in this case and thus the State's for cause challenges should have been rejected. We review the district court's decision striking these prospective jurors for cause for an abuse of discretion. Nolen, 2021 OK CR 5, ¶ 98, 485 P.3d at 853.

¶44 As discussed in the prior proposition, the law has long been that a juror in a capital case must be able to consider all three punishment options under the law and cannot be irrevocably committed to a particular punishment option prior to trial. Miller v. State, 2013 OK CR 11, ¶ 46-47, 313 P.3d 934, 953-54, overruled on other grounds by Harris v. State, 2019 OK CR 22, 450 P.3d 933. To sustain a for cause challenge, a panelist need not state that he or she will automatically vote against the death penalty, nor must the prosecution prove the panelist's bias with unmistakable clarity. Coddington v. State, 2011 OK CR 17, ¶ 5, 254 P.3d 684, 694. As stated in the prior proposition, we afford the district court's ruling considerable deference because of its personal observations and firsthand ability to assess each panelist's response to the death eligibility questions in context, including intonation and non-verbal responses which we are unable to glean from the written transcript. Id. "[W]e are particularly deferential regarding jurors who struggle to honestly and accurately answer the fundamental capital-eligibility question at stake: whether they can and will consider the death penalty, along with the punishments of imprisonment for life and imprisonment for life without parole, if the facts of the case establish that the defendant is eligible for the death penalty." Miller, 2013 OK CR 11, ¶ 51, 313 P.3d at 955. This Court generally finds no abuse of discretion in striking a panelist for cause where the district court gave both parties a fair opportunity to question the panelist and he or she simply cannot come to a definitive conclusion. Id. We recognize, however, that the district court should not excuse for cause panelists who oppose, harbor doubts, or express scruples regarding imposing the death penalty provided they can meaningfully consider it. Id. 2013 OK CR 11, ¶ 47, 313 P.3d at 953-54.

Prospective Juror S.C.

¶45 S.C. raised her hand when the court asked whether any panelist was unable to consider the three punishment options for first degree murder. S.C. explained that she was "against the death penalty[.]" The court asked whether, assuming the prerequisites for imposing the death penalty existed, were her reservations so strong that regardless of the law and evidence she would not consider imposing a death sentence. S.C. replied that she would not consider it regardless of the facts and circumstances. The State moved to excuse S.C. based upon her responses about the death penalty. The court elected to allow the parties to question her.

¶46 The prosecutor laid out the obligations of jurors in deliberations in a capital case and asked S.C. whether she could, in good faith, participate in deliberations and consider a death sentence if the State met its burden of proof. She said that she would deliberate and did not realize the law required consideration of all punishment options. The prosecutor stressed that the law required panelists to be able to affirm that if the process for a death sentence had been satisfied that a juror could give "meaningful consideration to actually assigning the death penalty, if the case warrants it." S.C. said "yeah." The prosecutor asked S.C. to explain her change of heart from her initial stance. She explained that she better understood the process and that she "didn't realize that it was the law that I had to, you know, go in there considering something even that I don't agree with, that I don't believe in, you know, for personal reasons . . . there's a multitude of reasons." Given her personal opposition to capital punishment, the prosecutor asked if she could live with whatever happened in this case. She reiterated that she did not agree with the death penalty and her disagreement is a "big factor[.]" She then questioned her ability to consider the death penalty and whether she could live with herself, noting it would probably affect her. The prosecutor pressed, over defense counsel's objection, whether she could vote for a death sentence and she said no because she does not believe in it. After argument at the bench, the prosecutor asked S.C. if she could envision any set of facts and circumstances in this case in which she would actually be able to cast a vote for the death penalty. She said no because she believes life without parole is fair and sufficient. Asked if she thought it was fair to the State for her to sit as a juror in Posey's case, she said "[p]robably not. I mean, I wouldn't."

¶47 In the midst of defense's questioning, defense counsel explained she was not trying to put anyone on the spot, but emphasized the importance of understanding the panelists' views on the death penalty in their "heart of hearts[.]" She asked if the panelists could consider all three punishments and S.C. volunteered she could consider all three and would listen to the reasons behind all three. Defense counsel confirmed S.C. was stating she could meaningfully consider all three. S.C. responded with a tentative "yeah, I mean yeah" to defense counsel's question asking whether she could imagine a situation where she could consider all three punishments. Once defense counsel finished questioning the panel, the State renewed its motion to strike S.C. based on her inability to consider the death penalty. The parties parsed her answers to argue their respective positions that she either should or should not be excused for cause. The prosecutor observed the difficulty in a capital case with a panelist who vacillates on the death penalty and a voir dire process where for cause challenges are not resolved in "real time" meaning immediately after a response or colloquy which provokes a challenge for cause. Defense counsel countered with now that S.C. knew the law, her final position was she would follow it and she should remain on the panel. The court excused S.C. without explanation.

¶48 We cannot find that the district court abused its discretion in excusing S.C. for cause. She vacillated from opposing capital punishment regardless of the circumstances to stating she could consider the three punishment options. Her responses about her ability to meaningfully consider the death penalty considered in their entirety, however, created doubt. The court observed the inconsistent nature of her responses pointing out she said both that she would consider the death penalty but would not consider voting for it. The conflict in these statements made it apparent to the district court that she would not, in reality, give a death sentence meaningful consideration. Her admission that it would be unfair to the State for her to serve on this jury further showed her ability to perform her duties as a juror was compromised, especially considering she believed life without parole was a fair and sufficient punishment for first degree murder. Giving deference to the district court who witnessed her demeanor during questioning, we find Posey's challenge to S.C.'s removal merits no relief.

Prospective Juror S.Y.

¶49 S.Y. did not raise her hand when the court asked about the panelists' ability to consider the three punishment options for first degree murder, indicating she was not able to consider the outlined options. She told the court that she had reservations about the death penalty because she believed anyone could be rehabilitated. The court asked whether, assuming the prerequisites for imposing the death penalty existed, were her reservations so strong that regardless of the law and evidence she would not consider imposing a death sentence. She replied, "I'm not sure I could sleep at night, if I sentenced someone to death." When asked if her feelings would "substantially impair" her ability to meaningfully consider the death penalty, she said, "[i]f the jury were composed completely of people who could impose the death sentence, I'm not sure that's fair." The court explained the need for seated jurors to be willing to consider the three options and S.Y. stated again that she was not sure she could impose a death sentence. She submitted that she "would like to serve as a person who might vote against the death penalty."

¶50 S.Y. told the prosecutor that on a scale of one to ten, her support for the death penalty was a two. When the prosecutor asked S.Y. if it was realistic that she could vote for death in the right case, she stated she believed the death penalty "should exist for sociopaths." The prosecutor tried to clarify her earlier response about serving as a juror who would vote against the death penalty and S.Y. said that she believed most, but not all, people can be rehabilitated. She felt her reservations about the death penalty would not affect her ability to fairly decide guilt or innocence. Nor did she think her reservations would affect finding aggravators. She said, "I believe I could trust my fellow jurors to find a person guilty or not guilty and then decide later on a sentence." The prosecutor pressed S.Y. on her ability to impose the death penalty and she said she could vote for a death sentence if psychologists found the accused was a sociopath. The prosecutor asked her, without knowing what the evidence would be, whether she could meaningfully consider the three penalty options and she answered affirmatively. S.Y. affirmed her questionnaire answer that she would need "very strong evidence" to impose death. With respect to the burden of proof, S.Y. said she would expect a greater standard of evidence from the State in this murder case than she would in a shoplifting case because of the resulting consequences. S.Y. also affirmed her questionnaire response that she believed the death penalty has been applied in a racially discriminatory manner based on the percentage of minorities in prison and on death row. That Posey was African American gave her "heightened concern" about being involved in the process because of her belief that the "poor and the non-white and the non-rich are unfairly treated" in the criminal justice system. She told the prosecutor, however, that she would keep an open mind through the process. The court took the prosecution's request to strike S.Y. for cause under advisement.

¶51 S.Y. told defense counsel that she understood the burden of proof and would hold the State to it in the first stage of trial. S.Y. further said she now understood the burden of proof for aggravators, and she would hold the State to their burden on those as well. When defense counsel asked if she could consider the three penalty options, S.Y. stated, "I think society must have the death penalty as a last resort. I can consider all three." The court clarified her response about the death penalty being appropriate only for sociopaths. She responded that she could vote for the death penalty if she found no possibility of redemption or rehabilitation and the person posed a risk of escape or killing someone in prison. That response concluded her questioning, and the district court entertained the prosecution's request to strike her for cause previously taken under advisement. The parties parsed her responses to argue their respective positions about her ability to meaningfully consider the death penalty. The court, however, found S.Y.'s responses about wanting to serve as a juror who might vote against the death penalty revealing and concerning, especially when considered with her other responses. After her removal, the district court noted for the record that S.Y.'s body language changed upon being informed she was excused. The court found her actions reflected that she "want[ed] to be an advocate in this case."

¶52 The district court did not abuse its discretion in excusing S.Y. for cause. Her responses--indicating she would meaningfully consider the death penalty--left room for doubt. Her stated parameters for a death sentence further cast doubt about her ability to perform her duties as a juror, especially considering her concerns about the inequity of the criminal justice system and her desire to serve as a voice against a death sentence. Giving deference to the district court who witnessed her demeanor both during questioning and after her removal, we reject Posey's challenge to S.Y.'s removal.

Prospective Juror C.B.

¶53 C.B. raised her hand when the court asked if the panelists could consider the three punishment options for first degree murder, indicating she could do so. C.B. told the prosecutor that on a scale of one to ten, her support for the death penalty was a three. The prosecutor inquired further about her score and C.B. said she understood the death penalty was part of the law, but she was unsure "if she [could] actually deliver it." She stated, reluctantly, that she could consider the death penalty provided the State met its burden. She went on to explain that knowing herself she did not know if she could vote to impose the death penalty. She affirmed her questionnaire responses expressing reservations about her ability to impose a death sentence. The prosecutor asked again whether she could meaningfully consider the penalty options, including the death penalty, and she responded, "I don't think so." The court interjected and asked whether, assuming the prerequisites for imposing the death penalty existed, were her reservations so strong that regardless of the law and evidence she would not consider imposing a death sentence. She responded by asking whether she could offer a situation where she would, but the court refused. She explained that she did not want to mislead the court and said, "I don't know that I can, regardless of what happens." The State moved to strike C.B. for cause and the court heard argument from the parties about her responses and ability to consider the death penalty. The court took the challenge under advisement and allowed the prosecutor to continue his questioning. C.B. affirmed her questionnaire response that she would rather not be the person to determine a possible death sentence. Ultimately, she agreed with the prosecutor's assessment that she could not trust herself to really consider all sentencing options regardless of the facts. The district court granted the State's renewed for cause challenge, finding the totality of the questioning showed she could not give meaningful consideration of the death penalty.

¶54 C.B. was conflicted in her responses concerning her ability to meaningfully consider the death penalty. She understood the death penalty was available under the law but questioned her ability to truly consider it if selected as a juror. She wanted to follow the law and "do the right thing" by following her oath as a juror which required her to meaningfully consider the death penalty. She, however, had doubts about her ability to do so and candidly conceded that she did not believe she could follow through if it came to weighing the question of punishment during deliberations. Her internal struggle was evident and supported the court's finding she was unable to perform her duties in a capital case. Accordingly, we find the district court did not abuse its discretion in excusing C.B. for cause.

Prospective Juror C.H.

¶55 C.H. raised her hand when the court asked if the panelists could consider the three punishment options for first degree murder, indicating she could do so. When asked by the prosecutor about her feelings on the death penalty, she said she would choose not to impose it "as much as possible." The prosecutor asked her to explain, and she said "[i]t's hard to say" without knowing the facts of the case, the background of those involved, and whether the accused has "room for redemption." On her questionnaire C.H. had written that the death penalty is a "hard punishment to wrap your head around." The prosecutor asked her to elaborate on her response, and she explained she was unsure how she felt about the death penalty and had no definitive answer about it. She agreed that she was generally opposed to it and believed it is applied unfairly. She also disclosed that her mother was a survivor of the Murrah Building bombing. Because she was in junior high when it happened, she did not believe the bombing had much of an impact on her views on capital punishment, noting her views on the death penalty had changed as she aged. She conceded that it would be difficult for her to consider a death sentence and that she believed the death penalty should be utilized in "extremely limited situations," although she was unable to identify those situations. She also agreed that she would not consider it in every case. When asked about her change in views, she explained that she, as a teenager, was in favor of the death penalty for those involved in the bombing because of her personal connection to the crime. Over time, however, she had tried to adopt an attitude of "positivity" and to balance "love and understanding." If there was a possibility of reform or help, that option in her opinion should be explored. She listed premeditated and mass murder on her questionnaire as possible death penalty offenses, but she acknowledged she would not consider the death penalty in every case and the ones where she would, "it would be very difficult" and in extremely limited situations. The court interjected and asked whether, assuming the prerequisites for imposing the death penalty existed, were her reservations so strong that regardless of the law and evidence she would not consider imposing a death sentence. Without particulars, she said she could not answer. The prosecutor explained to C.H. that her responses were confusing, and she agreed because she, herself, was confused about her views on capital punishment.

¶56 The State moved to strike C.H. for cause because of her inability to commit to meaningful consideration of the death penalty. Although the defense had unsuccessfully moved to quash the entire panel based on a purported inappropriate comment made to C.H. in front of the entire panel, defense counsel did not believe C.H. should be removed based on her views on capital punishment and objected to her removal on that basis. The court elected to leave C.H. on the panel at that time. Defense counsel questioned the panel but did not question C.H. individually. The State renewed its for cause challenge to C.H. based on her inability to consider all three punishments in conjunction with another for cause challenge of panelist L.H. whose family members had been murdered. The prosecutor and defense feared L.H.'s personal experience could affect her ability to perform her duties as a juror. The prosecutor argued that C.H. was similarly situated based on her responses and the court excused both C.H. and L.H.

¶57 We cannot find on this record that the district court abused its discretion in excusing C.H. for cause. Like C.B., C.H. was conflicted in her responses about her ability to meaningfully consider the death penalty. She was generally opposed to the death penalty and was unsure, without details, she could consider it in this case. She readily admitted her responses were confusing on the issue because she was uncertain about her stance on the death penalty. She appeared to question her ability to truly consider a death sentence if selected as a juror. Her hesitancy and indecision about her ability to consider the death penalty supported a finding that she was unable to perform her duties as a juror in a capital case. Giving due deference to the district court, we reject Posey's challenge to C.H.'s removal.

¶58 In conclusion, the record shows the district court allowed counsel a fair opportunity to question prospective jurors about the basic capital eligibility question at issue. The record contains substantial ambiguity or equivocal responses from the challenged panelists regarding their ability and willingness to consider the death penalty. We cannot find on this record that the district court abused its discretion in excusing S.C., S.Y., C.B., or C.H. Accordingly, we find reversal of Posey's death sentences is not required.

6. JURY SELECTION-BATSON CHALLENGE

¶59 Posey claims he was denied equal protection and an impartial jury drawn from a fair cross-section of the community because of the prosecution's discriminatory use of a peremptory challenge. He argues the prosecutor removed T.W., a minority panelist, from the venire without demonstrating adequate race-neutral reasons for her removal in violation of his constitutional rights and Batson v. Kentucky, 476 U.S. 79 (1986).

¶60 It is well settled that the government may not discriminate based on race when exercising peremptory challenges against prospective jurors in a criminal trial. Batson, 476 U.S. at 89. Posey insists the district court erred by failing to consider whether the purported race-neutral reasons supplied by the prosecutor were a pretext for discrimination. We review a district court's Batson rulings for an abuse of discretion. Grant v. State, 2009 OK CR 11, ¶ 26, 205 P.3d 1, 14.

¶61 The Court set forth the applicable analysis of a Batson claim in Grant, stating:

Batson establishes a three-part inquiry. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Generally, he does this by simply objecting to the removal and pointing out the apparent race of the panelist. Once he does so, the burden shifts to the prosecutor to articulate a clear, reasonably specific, and race-neutral explanation for striking the panelist. That explanation need not be particularly persuasive; it must only be race-neutral, and will be deemed so unless a discriminatory intent is inherent in the answer. Once a facially race-neutral explanation is given, the opponent of the strike bears the burden of proving discriminatory intent.

Id. See also Coddington v. State, 2006 OK CR 34, ¶ 11, 142 P.3d 437, 443.

¶62 Posey objected based on Batson to the prosecutor's use of the State's seventh peremptory challenge to excuse T.W. and asked for a race-neutral reason for the strike. The prosecutor explained that T.W. had worked on death row at the Oklahoma Department of Corrections (DOC) as well as at Avalon Corrections "which is central to some of the propensity evidence" in this case. The defense challenged the prosecutor's explanation for the panelist's removal because a white panelist, D.H., who had not been challenged by the State, also had a law enforcement background. In support of its stated reason, the prosecutor cited the private questioning of T.W. by both sides where she was asked extensively about her job duties at DOC and the defense's detailed questioning of her knowledge of the three punishment options and inmate classification structure. The prosecutor further observed T.W. indicated on her juror questionnaire that she was unsure she could be fair to either side and that during questioning she had expressed some hesitation about imposing the death penalty. Defense counsel countered that T.W. had explained her questionnaire responses and stated she could be fair. The prosecutor also offered the reason that T.W. had people in her family who had been convicted of crimes and that the State typically strikes those individuals regardless of race. Defense counsel observed there were panelists remaining who had family members with criminal backgrounds. The district court, without explanation, found the State had sufficiently articulated race neutral reasons and permitted the strike.

¶63 Because the prosecutor's reasons showed no discriminatory intent inherent in the explanation, the reasons given for the strike were race-neutral. See Smith v. State, 2007 OK CR 16, ¶ 12, 157 P.3d 1155, 1162 (holding "[a] neutral explanation in the context of this analysis means one based on something other than the race of the juror"). The district court's finding that the prosecutor's explanation provided facially valid reasons not revealing an intent to discriminate based on race therefore is supported by the record. The State's race-neutral explanations for striking the panelist shifted the burden to Posey to prove purposeful discrimination. Id., 2007 OK CR 16, ¶ 16, 157 P.3d at 1163.

¶64 Posey challenges the prosecutor's explanation for striking Panelist T.W. citing again as evidence of discrimination the State's failure to strike D.H., the white panelist with a law enforcement background and family member previously involved in the criminal justice system. We observe racially motivated discrimination, however, is not established simply because panelists of different races provide similar responses, and one is excused while the other is not. Grant, 2009 OK CR 11, ¶ 28, 205 P.3d at 15; Smith, 2007 OK CR 16, ¶ 19, 157 P.3d at 1164. We consider all the attendant circumstances relevant to whether the strike was racially motivated. Grant, 2009 OK CR 11, ¶ 28, 205 P.3d at 15. The fact that the prosecution failed to challenge other panelists who also had family members in prison or specifically D.H., with both a family member with a criminal background and a personal law enforcement background, does not alone erode the legitimacy of the race-neutral explanation for challenging T.W.

¶65 Our review of the record shows that the backgrounds of the two panelists were not comparable and that the differences in their law enforcement experience was considerable. T.W. was a former employee of the Oklahoma Department of Corrections and she had worked in various correctional facilities from 1992 to 2006. She was first a uniformed prison guard and then a correctional case manager. In her tenure, she had worked with inmates on death row and was somewhat familiar with the inmate classification system. She then worked for a contractor with Immigration and Customs Enforcement in Colorado and then for the Colorado DOC. Her last job in corrections was as the deputy warden for Avalon Corrections in Tulsa. Although T.W. said she would do her best to be fair, she voiced concern that she got out of corrections because she was tired of working with criminals and would be uncomfortable working with criminals again. She expressed concern about her partiality because of her previous employment. Conversely, Panelist D.H. worked for Oklahoma City Public Schools as a security guard. Although he was CLEET certified and carried a gun, badge, and handcuffs, he was not a commissioned peace officer and would only detain suspects for police. Before his current position, he served as a detention officer in the Oklahoma County juvenile system for five to six years. He maintained nothing about his current or former employment would affect his ability to be fair and impartial. His law enforcement background and exposure to the correctional system clearly differed from T.W.'s not only in terms of facilities but also responsibilities.

¶66 The record also showed that T.W. revealed she had two nephews presently serving a twelve-year prison sentence for a home invasion, burglary, and assault with a deadly weapon in Oklahoma County. D.H., on the other hand, had a brother who had been arrested and spent time in the Oklahoma County Jail ten plus years before and the charges were ultimately dismissed. It had been so long ago that D.H. could not remember the reason for the arrest.

¶67 A criminal defendant raising a Batson challenge may present a variety of evidence to support a claim that a prosecutor's peremptory strikes were made based on race, including "side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case." Flowers v. Mississippi, 588 U.S. 284, 302 (2019). The Court in Flowers, however, stressed the importance of the trial judge's role in the resolution of a Batson challenge:

The trial court must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties. The trial judge's assessment of the prosecutor's credibility is often important. The Court has explained that the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province. The trial judge must determine whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race. The ultimate inquiry is whether the State was "motivated in substantial part by discriminatory intent."

Id. at 302-03 (citations and quotations omitted).

¶68 Like the district court, we are not convinced on this record that the prosecutor impermissibly removed T.W. based on race, and Posey's attempt to compare T.W.'s personal experiences with those of D.H. falls far short of showing the prosecutor harbored discriminatory intent in the exercise of its peremptory challenge striking T.W. To conclude otherwise on this record would require us to ignore the considerable differences in the panelists' backgrounds as well as abandon the proper deference to the trial judge who observed and judged first-hand the prosecutor's demeanor and credibility. Accordingly, we find the district court's decision--to accept the prosecution's race-neutral reasons and to reject the defense's claim of purposeful discrimination--was not clearly erroneous. Id. at 303; Snyder v. Louisiana, 552 U.S. 472, 477, (2008) (holding "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous"). This claim is denied.

7. FIRST STAGE JURY INSTRUCTION ERROR

¶69 Posey argues the district court's instruction on the elements of Count 4 was defective and deprived him of due process. He insists this error requires reversal of his convictions on both Counts 3 and 4 because of the jury's general verdict concerning these alternative counts. Count 4 charged Posey with the felony murder of Bryor during the commission of the murder of his mother. Posey acknowledges that he failed to object to the court's instruction and that review is for plain error only. Metoyer v. State, 2022 OK CR 27, ¶ 20, 526 P.3d 1158, 1166. By statute, we may not reverse a judgment based upon misdirection of the jury unless the error "probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right." 20 O.S.2011, § 3001.1.

¶70 Instruction No. 35 provided the elements for Count 4 and stated:

No person may be convicted of murder in the first degree unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

First, the death of a human;

Second, the death occurred as a result of an act or event which happened in the defendant's commission of first degree murder;

Third, the elements of the crime of first degree murder that the defendant is alleged to have been in the commission of are as follows:

1. The death of a human;
2. The death was unlawful;
3. The death was caused by the defendant;
4. The death occurred during the murder of Amy Gibbins.

(O.R. XVII 3215).

¶71 Posey contends this felony murder instruction was incomplete because it did not include the basis of the first or second alternative predicate felonies in the third element under item number 4, i.e., either that Bryor was murdered during the malice aforethought murder of Amy or during Posey's commission of a forcible rape which resulted in the felony murder of Amy. Without the complete elements of the predicate felonies, he argues the instruction left unclear the specific underlying murder the jury had to find to convict on Count 4. According to Posey, the elements as written could be satisfied by three possible scenarios none of which are legally valid.[30] The State acknowledges that the uniform first degree felony murder instruction requires listing the elements of the predicate felony and that Instruction No. 35 failed to list the elements of the alternative predicate felonies in this case. The State nevertheless argues that no relief is required because the jury instructions, viewed as a whole, stated the applicable law.

¶72 The parties discussed Instruction No. 35 during the jury instruction conference. The court specifically asked about the wording of item number 4 under the third element. The prosecution argued that the template for the uniform first degree felony murder instruction referred to the elements of the crime of murder of a person other than the deceased and did not require inclusion of the elements of the alleged specific theories. The prosecutor contended that conviction required only a finding that Bryor's death was "caused while the Defendant is in the commission of a murder of some other person [his mother], not necessarily with malice aforethought or first degree or anything like that." The court confirmed the prosecution proposed that item number 4 read "the death occurred during the commission of the murder of Amy Gibbins" and defense counsel said, "I believe that is correct." Though there was additional brief discussion about the wording, the parties seemingly agreed on the court's wording as neither party objected to the instruction.

¶73 We reject jury instruction attacks when the jury instructions, as a whole, accurately state the applicable law. Metoyer, 2022 OK CR 27, ¶ 21, 526 P.3d at 1166. In this case, the district court instructed the jury in pertinent part: 1) that the instructions had to be considered as a whole; 2) that Posey was charged in Count 4 with the felony murder of Bryor Gibbins wherein Bryor's life was taken during the commission of a felony "that being the first degree murder of [his mother] resulting in the death of" Bryor; 3) that Posey was charged alternatively for the murder of Amy Gibbins namely, first degree murder with malice aforethought or first degree felony murder occurring during the commission of forcible rape; 4) that Posey was charged with Bryor's death in the alternative, with one alternative alleging his death occurred during the commission of the first degree murder of his mother; 5) that a person "is in the commission of first degree murder when he is performing an act which is an inseparable part of first degree murder, or performing an act which is necessary in order to complete the course of conduct constituting first degree murder, or fleeing from the immediate scene of a first degree murder." Reviewing the total instructions provided to Posey's jury, particularly the instruction defining "in the commission of murder," we find there is nothing confusing about the necessary proof required to prove Count 4-felony murder with the predicate felony of the murder of a person other than the deceased. Instruction No. 35 directed the jury to consider whether Bryor died from an act or event that occurred during the murder of his mother. The instructions, considered in toto, fairly and accurately stated the governing law.[31] There is no reasonable likelihood the jury could have convicted Posey based on a finding Bryor's murder occurred from an act or event in his own murder or an uncharged murder as argued in Posey's brief. Any error is this instruction does not rise to the level of plain error. No relief is required.

8. SECOND STAGE JURY INSTRUCTION ERROR

¶74 Posey next complains constitutional error occurred when the district court instructed his jury, per the uniform closing charge instruction in capital cases, that it could consider only evidence presented during the sentencing phase of trial to decide punishment.[32] He claims the instruction unfairly restricted the circumstances his jury could consider in mitigation of punishment by limiting the mitigating evidence to evidence received in open court.[33] Posey faults both defense counsel for failing to object to the instruction and the district court for failing to correct the instruction sua sponte. He acknowledges that he failed to object to the challenged instruction and that review is for plain error only. Metoyer, 2022 OK CR 27, ¶ 20, 526 P.3d at 1166.

¶75 Posey's reliance on Underwood v. State, 2011 OK CR 12, 252 P.3d 221 for this claim is misplaced. He takes out of context the following footnote in Underwood to argue a capital sentencing jury is free to consider "whatever circumstances" in mitigation to warrant a sentence less than death:

The unique, subjective nature of this particular aspect of capital sentencing is evidenced by the fact that, while jurors must unanimously agree on any aggravating circumstances that make the death penalty possible (again, by proof beyond a reasonable doubt), there need be no unanimity on the existence of, or weight assigned to, any mitigating factors. Each juror, individually and privately, weighs the unanimously-agreed-upon aggravators against whatever circumstances they believe might warrant a sentence less than death. See OUJI--CR (2nd) No. 4--78.

Underwood, 2011 OK CR 12, ¶ 62 n. 25, 252 P.3d at 246 n. 25. This footnote is in the Court's analysis considering and rejecting Underwood's complaint that his jury should have been instructed that a death sentence could not be considered unless the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. We found Underwood's reliance on Ring v. Arizona for this claim flawed.[34] Id., 2011 OK CR 12, ¶¶ 61-62, 252 P.3d at 246. We explained that the weighing of aggravating circumstances versus mitigating circumstances is a balancing process that is incompatible with the beyond a reasonable doubt standard of proof. Id., 2011 OK CR 12, ¶ 62, 252 P.3d at 246. We agreed with the Tenth Circuit that the weighing process in capital sentencing is a "highly subjective" and "largely moral" judgment "regarding the punishment that a particular person deserves" instead of a finding of fact that must be found beyond a reasonable doubt for imposition of the death penalty. Id. (citing United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir. 2007) (quoting Caldwell v. Mississippi, 472 U.S. 320, 340 n. 7 (1985)).

¶76 Contrary to his claim, the instruction challenged by Posey did not unfairly limit the consideration of mitigating circumstances in this case. The Underwood footnote, read in context, does not define the scope of mitigation evidence but rather addresses the burdens of proof concerning aggravating and mitigating circumstances and the process involved in the weighing of those circumstances in capital sentencing. The Court in no way suggested that the scope of mitigating evidence was limitless. Instead, each juror weighs "whatever" mitigating factors he or she believes exist in the case against the aggravating circumstances unanimously agreed upon by the jury to arrive at the sentence he or she feels is warranted by the evidence.

¶77 Furthermore, our review of the challenged instruction in conjunction with the other sentencing phase instructions defeats Posey's claim that it unfairly limited his jury's consideration of mitigating circumstances. See Kurtanic v. State, 2023 OK CR 13, ¶ 6, 534 P.3d 1055, 1058 ("The general rule is that where the trial court's instructions submitted to the jury, considered as a whole, fairly and correctly state the applicable law such instructions are sufficient.") The district court instructed Posey's jury that mitigating factors need not be unanimous but could be subjective to each juror.[35] The court listed seventeen mitigating circumstances based on the penalty phase evidence. Following the list, the instruction provided, "In addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well." Considering the instructions as a whole, we find the challenged instruction did not unfairly limit the jury's consideration of mitigating circumstances. Finding no instructional error, plain or otherwise, we deny this claim.

9. AGGRAVATING CIRCUMSTANCE INSTRUCTION

¶78 Posey contends he was denied a fair sentencing proceeding because of the district court's failure to adequately instruct his jury on the alleged aggravating circumstance that he knowingly created a great risk of death to more than one person. His complaint is two-fold. He claims not only that the district court erred by rejecting his requested instruction on this aggravator but also that the district court erred by not defining sua sponte the term "knowingly" as used in conjunction with this aggravating circumstance.[36] According to Posey, the jury's finding of this aggravator's existence in both murders was the result of the lack of a uniform instruction on its application and misleading statements from the prosecution rather than sufficient evidentiary support. We review the district court's ruling rejecting Posey's proposed instruction on this aggravator for an abuse of discretion and his complaint about the absence of a definition for the term "knowingly" for plain error only.

¶79 We have rejected complaints that the great risk of death to more than one person aggravating circumstance requires a more specific uniform instruction on how to apply it. Nolen, 2021 OK CR 5, ¶ 124, 485 P.3d at 858-59. We have found instead that the statutory language explaining this aggravating circumstance sufficiently informs jurors what is necessary to support its existence in each case. Bosse v. State, 2017 OK CR 10, ¶ 73, 400 P.3d 834, 860; Eizember, 2007 OK CR 29, ¶¶ 137-39, 164 P.3d at 241. The district court instructed Posey's jury using the straightforward statutory language, stating the jury had to determine whether the aggravating circumstances alleged by the State existed beyond a reasonable doubt, including that the defendant during the commission of the murder knowingly created a great risk of death to more than one person. We continue to find that the use of the statutory language is sufficient and hold that the district court did not err by rejecting Posey's proposed instruction on this aggravating circumstance.

¶80 Nor do we find error in the absence of a definition for the term "knowingly" as used in the great risk of death to more than one person aggravator. "The gravamen of the circumstance is . . . the callous creation of the risk to more than one person." Fuston v. State, 2020 OK CR 4, ¶ 130, 470 P.3d 306, 334 (quoting Ryder v. State, 2004 OK CR 2, ¶ 77, 83 P.3d 856, 874). The State must show the defendant's murderous actions toward one victim created a risk of death to another who was in close proximity in terms of time, location, and intent to the killing. Fuston, 2020 OK CR 4, ¶ 130, 470 P.3d at 334. The term "knowingly" is commonly understood to connote awareness. By instructing the jury it had to find Posey "knowingly" created a great risk of death to more than one person when he murdered Amy and then her son, the jury understood it had to find his acts in killing each victim were done with an awareness of the risks posed by his actions to the others who were nearby. Because the plain language of this aggravator in the court's instructions sufficiently conveyed the required proof, we find this claim is without merit.

10. SUFFICIENCY OF EVIDENCE OF AGGRAVATOR

¶81 Posey argues the evidence was insufficient to prove he knowingly created a great risk of death to more than one person when he set the fire that killed Bryor. He contends the district court abused its discretion when it failed to sustain his objection to this aggravating circumstance and asks that we either vacate his death sentence and remand for resentencing or favorably modify his sentence on Counts 3 and/or 4. When the sufficiency of the evidence of an aggravating circumstance is challenged on direct appeal, we review the record to determine whether the evidence, considered in the light most favorable to the State, was sufficient for a rational trier of fact to find the existence of the aggravating circumstance beyond a reasonable doubt. Fuston, 2020 OK CR 4, ¶ 129, 470 P.3d at 334.

¶82 Under Oklahoma law, a defendant who knowingly places others in jeopardy of death during the commission of a murder is eligible for the death penalty. 21 O.S.2011, § 701.12(2). This aggravating circumstance applies where the defendant's actions place a person(s) in the vicinity of his or her murder victim at an actual risk of death and the defendant knows that risk exists. Miller, 2013 OK CR 11, ¶ 177, 313 P.3d at 988. To prove this aggravator, there must be evidence that another person(s) was near the victim at the time of the murder and in jeopardy of suffering real harm by the defendant's actions in killing the victim. Id. 

¶83 The crux of Posey's claim is that Amy was not at any risk of death when Bryor died in the fire he set because she was already dead.[37] He contends that Bryor was the only one in danger from the fire he started which ultimately took the child's life. He maintains a live person other than the murder victim is required for application of this aggravator.

¶84 The State argues that Posey's acts of pouring gasoline and a lubricating oil near Amy's body and igniting a fire that killed Bryor also created a great risk of death to Amy. The State, for the first time, disputes the contention that Amy was dead before the fire started, observing there was no first-hand account of the exact moment she took her last breath. It acknowledges her carbon monoxide level was negative and she did not inhale enough smoke or soot to confirm she was alive during the fire. Nevertheless, the State contends no conclusive proof ruled out she was still alive. Hence, the State maintains that viewing the evidence in the light most favorable to the prosecution, the evidence sufficiently proved Posey knowingly created a great risk of death to Amy when he killed her son by setting fire to their home.

¶85 The State charged Posey with Bryor's murder, alleging Bryor died during Posey's commission of arson (Count 3) or, in the alternative, in the course of Posey's murder of his mother (Count 4). The State alleged Posey started a fire in the house after killing Amy and Bryor died in the fire Posey started. The State's notice of this aggravating circumstance alleged that at the time Posey started the fire that killed Bryor, his mother was already dead.[38] During closing argument, the prosecutor argued this aggravating circumstance was proven because of the deaths of two persons on the "same night in the same house within minutes of each other at the same invasion by the same man."

¶86 We have often stated that this aggravator is not determined by the number of victims killed, but by the "callous creation of the risk to more than one person[]" during the commission of a particular murder. Fuston, 2020 OK CR 4, ¶ 130, 470 P.3d at 334 (quoting Ryder, 2004 OK CR 2, ¶ 77, 83 P.3d at 874). We have generally upheld this aggravator in cases where the "defendant either killed two or more people contemporaneously with the intent to kill all the victims or contemporaneously injured or killed one or more bystanders in the line of fire." Jackson v. State, 2006 OK CR 45, ¶ 43, 146 P.3d 1149, 1163. Conversely, we have invalidated this aggravator in connection with the death of a second victim when the first victim was not in jeopardy from the homicidal act that killed the second victim. See Hanson v. State, 2009 OK CR 13, ¶ 43, 206 P.3d 1020, 1033.

¶87 The circumstances and argument presented in this case are unlike those in our prior cases. The two murders share an undeniable connection insofar as they occurred in the same small house within a short period of time. During oral argument in this case, the parties addressed questions concerning whether this aggravator should be invalidated because scientific evidence showed Amy was dead when Posey set the house ablaze and whether Posey must have known Amy was still alive to knowingly create a great risk of death to her by starting the fire that killed her son. We need not parse the parameters of this aggravator in this case, however, because even if Posey's conduct of setting the house ablaze did not constitute the knowing creation of great risk of death to Amy, the submission of this aggravator to the jury did not skew the jury's decision to impose the death penalty.

¶88 When an aggravator is invalidated, we assess the impact of the invalidated aggravator on the defendant's death sentence. We consider whether the remaining aggravating circumstances outweigh the mitigating circumstances and whether the weight of the improper aggravator is harmless. Tryon, 2018 OK CR 20, ¶ 148, 423 P.3d at 656; Malone v. State, 2013 OK CR 1, ¶ 87, 293 P.3d 198, 221. Assuming arguendo the great risk of death aggravator is invalid on Counts 3 and/or 4, the record shows that Posey was on notice early on that the prosecution would rely on evidence of his commission of both murders to support its continuing threat allegation, i.e., evidence that he murdered two people to show his tendency to engage in violent acts which would likely continue into the future.[39] An invalidated sentencing factor renders a death sentence unconstitutional "by reason of its adding an improper element to the aggravation scale in the weighing process unless one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." Brown v. Sanders, 546 U.S. 212, 220 (2006) (footnote omitted). In other words, impermissible skewing in the weighing process occurs, and gives rise to constitutional error, "only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." Id. at 221. There was no impermissible skewing and no constitutional error in this case from the purportedly invalid great risk of death to more than one person aggravator with respect to Counts 3 and/or 4 because the continuing threat aggravator enabled Posey's jury to give aggravating weight to the same facts and circumstances used to support the purportedly invalid aggravator. See Tryon, 2018 OK CR 20, ¶ 148, 423 P.3d at 656.

¶89 When there is no constitutional violation or skewed sentence from the consideration of an invalidated aggravating circumstance, we conduct an independent reweighing of the aggravating and mitigating evidence to determine the validity of the death sentence. Id., 2018 OK CR 20, ¶ 149, 423 P.3d at 656; Malone, 2013 OK CR 1, ¶ 87, 293 P.3d at 221-22. In this regard, we will reweigh the evidence and may uphold the death sentence provided we determine the remaining aggravating circumstances outweigh the mitigating circumstances and the weight of the improper aggravator was harmless. Tryon, 2018 OK CR 20, ¶ 149, 423 P.3d at 656. If, looking at the record, the Court finds that the elimination of the improper aggravator did not affect the balance beyond a reasonable doubt, we may find submission of an improper aggravator to be harmless error. Id. 2018 OK CR 20, ¶ 149, 423 P.3d at 656-57.

¶90 In the present case, two aggravating circumstances remain: the especially heinous, atrocious, or cruel aggravator and the continuing threat aggravator. 21 O.S.2011, § 701.12 (4), (7). The evidence supporting these two remaining aggravating circumstances was compelling and proved their existence beyond a reasonable doubt. The evidence showed not only Posey's prior rape and attack on M.K.M. but also numerous instances of prior violent acts towards classmates, acquaintances, strangers, as well as another inmate, thereby supporting the existence of the continuing threat aggravator. Posey's murder of young, defenseless Bryor to conceal his crimes against the child's mother likewise supports this aggravator as does the callous nature of the killing itself. Moreover, the evidence supported a finding that both victims endured conscious physical suffering thus supporting the especially heinous, atrocious, or cruel aggravator. The evidence showed Posey broke into Amy's home in the nighttime, raped and beat her, and extracted the pin number to her debit card during the attack. He then set the house ablaze as he fled to drain Amy's bank account from an ATM. Bryor died in the fire started by Posey from thermal burns and smoke inhalation as he hid in the living room and his brutally raped and murdered mother lay in his nearby bedroom in the tiny home they had shared.

¶91 Posey presented abundant mitigation evidence from his friends and family members covering virtually every aspect of his life. These included accounts concerning Posey's family history and upbringing focused in large part on the nature of his abusive relationship with his mother. Posey presented evidence his mother was emotionally distant and both physically and emotionally abusive, leaving him and his twin brother often to fend for themselves. She restricted their food intake and other resources in the home while adequately providing food, transportation, and entertainment for herself. She was routinely absent from the home and provided little to no supervision. She failed to cooperate with treatment providers when Posey was placed in the custody of the Office of Juvenile Affairs at age 14. Although she denied it, his evidence showed that she evicted him at age 16, which forced him to shelter with and obtain emotional and material support from friends and their families. Posey presented multiple friends and family members who described the emotional and material support he provided them in times of need, their willingness to maintain contact with him in prison, and their pleas for mercy in sentencing. His mitigation case also included evidence that he was a responsible and helpful inmate in the county jail who had been of assistance to staff.

¶92 After reweighing the remaining valid aggravating circumstances against the mitigating evidence, we find the aggravating circumstances outweigh the mitigating evidence. Had the jury considered only these two valid aggravating circumstances in its sentencing determination, we are convinced beyond a reasonable doubt the jury would have imposed the same sentence of death on Counts 3 and/or 4. Accordingly, we find relief is not required.

11. INEFFECTIVE ASSISTANCE OF COUNSEL

¶93 Posey claims he is entitled to relief because of ineffective assistance of trial counsel. He faults trial counsel for: 1) failing to lodge a double jeopardy objection; 2) failing to contemporaneously object to the forced testimony of T.W.; 3) failing to object to first stage jury instruction No. 35 and second stage jury instruction No. 20; and 4) failing to request a second stage jury instruction on the term "knowingly" with respect to the alleged aggravating circumstance that he knowingly created a great risk of death to more than one person. (See Propositions 1, 3, 7, 8, and 9).

¶94 This Court reviews claims of ineffective assistance of counsel to determine: (1) whether counsel's performance was constitutionally deficient; and (2) whether counsel's performance prejudiced the defense depriving the defendant of a fair trial with reliable results. Strickland v. Washington, 466 U.S. 668, 687 (1984); Malone, 2013 OK CR 1, ¶ 14, 293 P.3d at 206. Prejudice in this context is evidence supporting "a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial would have been different." Fulgham v. State, 2016 OK CR 30, ¶ 16, 400 P.3d 775, 780. "The likelihood of a different result must be substantial, not just conceivable." Malone, 2013 OK CR 1, ¶ 16, 293 P.3d at 207 (quoting Harrington v. Richter, 562 U.S. 86, 112 (2011)). Unless both showings are made, we will not find that the conviction resulted from a breakdown in the adversary process and produced an unreliable result. Malone, 2013 OK CR 1, ¶ 14, 293 P.3d at 206.

¶95 We rejected Posey's double jeopardy claim and his jury instruction challenges in Propositions 1, 7, 8, and 9, supra. We also rejected his challenge to the material witness warrant used to secure the testimony of T.W., finding that he lacked standing to assert the rights of a third party. See Proposition 3, supra. Thus, he cannot show the necessary prejudice to prevail, i.e., a reasonable probability the outcome of his trial would have been different, had defense counsel objected to the challenged evidence and instructions. This portion of his ineffective assistance of counsel claim is therefore denied.

¶96 Posey also faults trial counsel for failing to present expert testimony on the effects of the childhood and adolescent trauma, abuse, and neglect he suffered at the hands of his mother. He maintains one or more experts in child and adolescent psychology were necessary to explain the impact his mother's abuse had on him and to provide context so the jury could properly weigh the balance of aggravating and mitigating circumstances in its sentencing decision. He contends the prosecution team recognized this missing link in his mitigation case and repeatedly criticized and devalued his mitigating evidence because of it during second stage. According to Posey, such an expert was not only available but also recommended to the defense team by another defense expert.

¶97 In conjunction with this claim, Posey filed an Application for Evidentiary Hearing on Sixth Amendment Claims pursuant to Rule 3.11(B), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2024). His application includes an extrajudicial affidavit from clinical psychologist, Dr. Rahn Yukio Minagawa, Ph.D., who could have testified about the long-term effects of childhood and adolescent abuse and neglect. Dr. Minagawa believes that his expert testimony would have been helpful to the jury in understanding the adverse impact of Posey's childhood and teenage trauma that contributed to his development.

¶98 The analysis of an ineffective assistance of counsel claim predicated on counsel's failure to adequately investigate and present mitigating evidence in a capital sentencing proceeding is essentially the same as other ineffective assistance claims, "requiring a showing of both deficient attorney performance and prejudice." Malone v. State, 2007 OK CR 34, ¶ 112, 168 P.3d 185, 229. We explained in Malone:

The main difference is in the prejudice analysis, where the reviewing court must determine whether there is a "reasonable probability" that if trial counsel had presented the omitted mitigating evidence, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." In making this determination, the newly proffered mitigating evidence must be considered along with the mitigating evidence that was presented and then weighed against the aggravating evidence that was presented. Finally, we also consider whether there is a reasonable probability that inclusion of the omitted mitigating evidence could have "alter[ed] the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."

Id. (footnotes omitted).

¶99 In reviewing ineffective assistance claims, we employ a strong presumption of regularity in trial proceedings and competency of counsel. Rule 3.11(B)(3)(b)(i), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2024). Hence, an appellant's application for evidentiary hearing must contain sufficient information to show us, by clear and convincing evidence, a strong possibility that trial counsel was ineffective for failing to identify or use the evidence at issue. Id. Where nothing in the supplemental materials alters or amplifies in any compelling way the portrait that emerged from the trial evidence and testimony, this Court will find the extrajudicial materials fail to establish by clear and convincing evidence a strong possibility that trial counsel was ineffective. See Sanchez v. State, 2009 OK CR 31, ¶ 104, 223 P.3d 980, 1013.

¶100 The defense called twenty-nine mitigation witnesses in the penalty phase in an effort to convince the jury to spare Posey's life and extend him mercy for his monstrous crimes which culminated in the deaths of Amy and her young son. Most of the mitigation witnesses were friends and family who knew Posey at various stages in his life. The testimony fell into two main categories, namely evidence about the abuse and neglect he suffered as a child and teen at the hands of his mother and evidence of the caring, supportive man he was to many people.[40] The mitigation evidence included testimony concerning his mother's withholding of food, clothing, toys, affection and attention, his preference to live in state custody where he thrived rather than with his mother, his mother's failure to provide adequate supervision, his mother's strict discipline, his mother's physical and verbal abuse, his mother's use of alcohol during pregnancy and his childhood and adolescence, his mother's caring treatment of her pets over her children, his living arrangements with friends after his mother evicted him, his mother's withholding of the identity of his father, his fear of his mother and his demeanor changes in her presence, his good behavior as an inmate in the county jail, his family background including the time as a young child he lived in the loving home of his grandmother before her death, his generosity to friends and family in times of need, his friendly and outgoing personality, his protective and respectful nature with female friends, his emotional and financial support of friends, his character as a role model, his care for the Garrett Tanner family when Tanner's mother was dying, and the love of Posey's friends and family, who want to continue to have a relationship with him and who do not want him to receive the death penalty.

¶101 Dr. Minagawa states in his affidavit that he was "appalled" that Posey's trial team failed to call an expert because, in his experience, jurors want to know how a defendant's history may have contributed to his or her criminal actions. He claims the jurors in this case were left with an unconnected and incomplete presentation of the abuse and neglect Posey experienced, which lessened the impact of his mitigation evidence.

¶102 Dr. Minagawa admits that Posey had been evaluated by Dr. Antoinette R. McGarrahan, Ph.D., who conducted numerous neuropsychological tests and found no evidence Posey suffered from any intellectual disability or extensive mental health issues. He states that it was Dr. McGarrahan who recommended the defense hire a child development expert like himself to "testify about the documented history of abuse, neglect and trauma" Posey had suffered. Trial counsel did not heed Dr. McGarrahan's recommendation, and according to Dr. Minagawa, "presented individual witnesses who gave somewhat disjointed testimony about his upbringing and abuse at the hands of his mother, without providing a narrative that tied those details together in a way that would persuade the jurors to consider a lesser sentence than death." Dr. Minagawa's affidavit attests that trial counsel was aware of Dr. McGarrahan's findings and recommendation but nevertheless elected not to further explore that avenue as part of the defense's mitigation strategy.

¶103 It has long been the case that where counsel makes an informed choice, his or her decision to pursue a particular strategy over another, even if unsuccessful, is virtually unchallengeable. Lee v. State, 2018 OK CR 14, ¶ 14, 422 P.3d 782, 786. Counsel's knowledge of the abuse and neglect and awareness of Dr. McGarrahan's testing that proved unhelpful in mitigation support a finding that counsel rejected her recommendation for retention of a child development expert based on sound trial strategy. Trial counsel knew the prosecution would cross-examine any child development psychologist about neuropsychological testing and mental health issues associated with victims of abuse and neglect which did not weigh in Posey's favor. The expert would either have to disclose, if known, the results of Dr. McGarrahan's testing or plead ignorance and risk looking inexperienced and possibly incompetent. That counsel was well aware of Dr. McGarrahan's recommendation weighs in favor of finding counsel exercised reasonable and deliberate trial strategy in deciding the fashion and manner with which to present the defense's mitigation case concerning Posey's traumatic childhood.

¶104 The record reveals the defense sought to show that the underlying basis for Posey's periodic abhorrent criminal behavior stemmed from the infliction of his mother's long-term abuse and neglect during his childhood and adolescence which negatively affected his development. To counter the portrait of an irreparably damaged person whose trauma continued to pervade his adulthood and emotional responses, the defense sought to humanize him and show he had also developed into a compassionate, supportive person with many friends thereby making him worthy of mercy. Too much emphasis on Posey as permanently traumatized from his mother's abuse and neglect may very well have backfired and been interpreted as aggravating evidence that he was beyond repair and posed a continuing threat to society. All things considered, Dr. Minagawa's testimony would have been inconsistent with the remainder of the mitigation strategy and may have diminished the impact of the testimony from Posey's friends and family seeking leniency and mercy.

¶105 The mitigation case in our review was credible and well-developed. Counsel chose to present evidence of Posey's childhood and adolescence through witnesses who personally interacted with him and related firsthand testimony of his circumstances rather than Dr. Minagawa's sterile textbook conclusions gleaned from various records, police reports, interview materials, and trial transcripts of the proceeding.[41] Counsel evidently believed the lay witnesses were better poised to offer the sort of intimate mitigation case that would resonate with jurors rather than presenting the opinions of an impersonal expert. The record shows the jury was well aware of Posey's upbringing and knew, based upon the testimony of the lay witnesses, that Posey's childhood was rife with purported abuse and neglect. That those circumstances would have affected his development and behavior was not beyond the common-sense grasp of lay jurors. This precise view was, in fact, expressed by defense counsel in closing argument:

I'm not saying that Vanita Posey is responsible for this crime by any stretch of the imagination. I wouldn't insult you in that way, but we all know that when you damage your kid to the point that he was damaged, there are going to be effects. You-all have seen it in your own lives. You've all known kids who are so damaged by their parents that they -- they were damaged adults.

¶106 We are simply not convinced on this record that Posey has shown by clear and convincing evidence a strong possibility that trial counsel was ineffective for choosing to forgo presentation of Dr. Minagawa's expert testimony. For reasons previously discussed, trial counsel's decision was part of a strategy to present Posey's personal history through mitigation witnesses who shared their knowledge of and personal experiences with him. Some focused on his abusive upbringing, while many attested repeatedly to his upstanding character as a friend, confidant, role model, and all around good and respectful human being. This strategy was reasonable, and the supplemental affidavit does not alter or amplify in any compelling way the portrait that emerged from the evidence and testimony at trial.

¶107 Based on the penalty phase evidence, we conclude that the proffered evidence concerning abuse and neglect and its accompanying impact on Posey's development would not have appreciably altered the balance of aggravating and mitigating circumstances considered by the jury at trial. More specifically, we are not persuaded that Dr. Minagawa's proffered opinions regarding Posey's development would have caused the jury to find that the mitigating factors outweighed the aggravating factors and to, in turn, sentence him to life in prison rather than death. Accordingly, we find that Posey has not shown by clear and convincing evidence a strong possibility that trial counsel was ineffective or shown a reasonable probability that expert testimony would have affected the outcome of the trial. Therefore, he is not entitled to an evidentiary hearing, and his motion, as well as this claim, are denied. See Simpson v. State, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-06.

12. MOTION FOR NEW TRIAL

¶108 Posey filed a motion for new trial based on newly discovered evidence on October 6, 2021, along with his direct appeal brief and motion for evidentiary hearing. Appended to his motion for new trial is an affidavit from appellate counsel as well as seven attachments. (Exhibits A through A-6) Appellate counsel states he received an email on December 18, 2020, from one of the assistant district attorneys who prosecuted this case concerning the defense's alternate suspect, Brady Almaguer. The email is attached as Exhibit A. The email references an incident report and screenshots of text messages the prosecutor received from the Harmon County Sheriff's Office involving a series of alleged threatening communications sent by Almaguer to Elizabeth Whorton. The incident report and screenshots of the texts attributed to Almaguer are attached as Exhibits A-2 through A-6. The prosecutor believed one of the text messages may have referred to the murder of Amy Gibbons and her son for which Almaguer in the text seemingly confesses. The prosecutor informed appellate counsel that he had requested a thorough follow-up investigation concerning these text messages by the OSBI case agent despite credible alibi evidence presented for Almaguer at trial.

¶109 Posey's motion for new trial is untimely and must be dismissed.[42] Under 22 O.S.2011, § 952, a defendant may file a motion for new trial when new evidence material to the defendant is discovered and the new material could not have been discovered with reasonable diligence before trial. Motions for new trial filed during the pendency of a direct appeal shall be filed with this Court rather than the district court. Rule 2.1(A)(3), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2024). The Legislature has specified the time limits applicable to motions for new trial. 22 O.S.2011, § 953. "A motion for a new trial on the ground of newly discovered evidence may be made within three (3) months after such evidence is discovered but no such motion may be filed more than one (1) year after judgment is rendered." 22 O.S.2011, § 953. Section 953 sets the outer time limit for such motions for new trial at one year from the imposition of Judgment and Sentence by the district court. See Underwood, 2011 OK CR 12, ¶ 91, 252 P.3d at 254 (stating "[s]uch a motion must in any event be filed within one year of the imposition of Judgment and Sentence."); Rule 2.1(A)(3) (requiring motion for new trial based on newly discovered evidence be filed "prior to the expiration of one (1) year from the date that the Judgment and Sentence is pronounced").

¶110 The district court entered Judgment and Sentence in this case on July 22, 2019, and signed the Death Warrant that same day. The prosecutor sent the attached email to appellate counsel on December 18, 2020, more than a year after formal sentencing. Posey's Motion for New Trial was not filed in this Court until October 6, 2021--more than two years after the imposition of Judgment and Sentence and nearly a year after the new evidence had been discovered. Because Posey's motion for new trial was not timely filed under Section 953, we are procedurally barred from considering it on the merits. See Harris v. State, 2019 OK CR 22, ¶¶ 94-95, 450 P.3d 933, 966-67 (dismissing capital defendant's motion for new trial based on newly discovered evidence because it was filed well over a year after formal sentencing and was untimely).

13. MANDATORY SENTENCE REVIEW

¶111 This Court must determine in every capital case: (1) "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor" and (2) "[w]hether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance . . . ." 21 O.S.2011, § 701.13(C)(1) & (2). After conducting this review, this Court may order any corrective relief that is warranted or affirm the sentence. 21 O.S.2011, § 701.13(E).

¶112 Having reviewed the record in this case, we find that Posey's death sentence on Counts 1 and/or 2 was not the result of trial error or improper evidence or witness testimony and that the death sentence was not imposed under the influence of any arbitrary factor, passion, or prejudice. The jury's finding on Counts 1 and/or 2 that Posey (1) knowingly created a great risk of death to more than one person; (2) that the murder was especially heinous, atrocious, or cruel; and (3) that there existed a probability that Posey would commit criminal acts of violence that would constitute a continuing threat to society was amply supported by the evidence. Weighing the aggravating circumstances against the mitigating evidence presented, we find, as did the jury below, that the aggravating circumstances in this case outweighed the mitigating circumstances.

¶113 Even assuming the knowingly creating a great risk of death aggravator is invalid on Counts 3 and/or 4, we find upon reweighing that the remaining valid aggravating circumstances outweighed the mitigating evidence and supported the death sentence. The jury's finding on Counts 3 and/or 4 that (1) the murder was especially heinous, atrocious, or cruel; and (2) that there existed a probability that Posey would commit criminal acts of violence that would constitute a continuing threat to society was well supported by the evidence. Had the jury considered only these valid aggravating circumstances, we are convinced beyond a reasonable doubt that the jury would have imposed the same sentence of death. We are also satisfied from our review of the record that neither passion, prejudice, nor any other arbitrary factor contributed to the jury's sentencing determination.

DECISION

¶114 The Judgment and Sentence of the District Court is AFFIRMED. Posey's Application for an Evidentiary Hearing on Sixth Amendment Claims is DENIED. Posey's Motion for New Trial is DISMISSED. The case is REMANDED to the district court for entry of an Order Nunc Pro Tunc to correct Posey's Judgment and Sentence to reflect the $3,000.00 fine imposed on Count 5 has been waived. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2024), the MANDATE is ORDERED issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF CANADIAN 
COUNTY, THE HONORABLE BOB W. HUGHEY,
ASSOCIATE DISTRICT JUDGE

 

 
 
 
 APPEARANCES AT TRIAL
 
 
 APPEARANCES ON APPEAL
 
 
 
 
 MITCHELL SOLOMON
 SHEA SMITH
 BENJAMIN C. BROWN
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 111 N. PETERS AVE., SUITE 100
 NORMAN, OK 73069
 ATTORNEYS FOR DEFENDANT
 
 
 MICHAEL D. MOREHEAD
 ALEX RICHARD
 JAMIE D. PYBAS
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 111 N. PETERS AVE., SUITE 100
 NORMAN, OK 73069
 ATTORNEYS FOR APPELLANT
 
 
 
 
 ERIKA SIMPSON
 JOHN SALMON
 AUSTIN MURREY
 ASST. DISTRICT ATTORNEYS
 CANADIAN CO. COURTHOUSE
 303 N. CHOCTAW
 EL RENO, OK 73036
 ATTORNEYS FOR STATE
 
 
 JOHN M. O'CONNOR
 ATTORNEY GENERAL
 OF OKLAHOMA
 JULIE PITTMAN
 JOSHUA R. FANELLI
 ASST. ATTORNEYS GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 ATTORNEYS FOR APPELLEE
 
 
 

 

 

OPINION BY: ROWLAND, P.J.
MUSSEMAN, V.P.J.: Concur
LUMPKIN, J.: Concur in Results
LEWIS, J.: Concur
HUDSON, J.: Concur

FOOTNOTES

[1] Posey's jury also convicted him of Debit Card Theft (Count 5), in violation of 21 O.S.2011, § 1550.22(a), and fixed punishment at three years imprisonment and a $3,000.00 fine. He does not substantively challenge that conviction on direct appeal. See Footnote 5, infra.

[2] 21 O.S.2011, § 701.12(2).

[3] 21 O.S.2011, § 701.12(4).

[4] 21 O.S.2011, § 701.12(7).

[5] Judge Hughey waived all fines and costs in this matter at formal sentencing. Posey correctly observes that his Judgment and Sentence reflects the $3,000.00 fine on Count 5, which was waived. Accordingly, we direct the district court to correct this error by an Order Nunc Pro Tunc.

[6] Because the two victims share the same last name, we will refer to the victims by their first names to distinguish them.

[7] There was evidence of forced entry through the front door. The State's expert determined that the fire was incendiary, and investigators found the presence of accelerants near Amy's body which was near the fire's origin point.

[8] Evidence showed Amy had used her debit card throughout the day before her death. Posey claimed he got the card when he was breaking into cars and found Amy's debit card in a Ford Platinum truck near her home. Police found no evidence of any car break-ins that evening. Other investigation showed, however, that Posey may have had financial problems.

[9] The criminalist conducted no further testing of the anal swab after P30, a protein found in high concentrations in seminal fluid, was not detected on the anal swab.

[10] The criminalist explained that she was able to separate the epithelial cells, i.e., skin cells, and the sperm in the test sample from Amy's vaginal swab.

[11] This test is useful where there may be low amounts of male DNA which can be masked by high concentrations of female DNA.

[12] The district court also submitted Instruction No. 16 which instructed the jury to give "separate consideration for each charge in the case." It further provided:

The defendant has been charged with the murder of Amy Gibbins by two (2) alternative counts, Count 1 and Count 2. The defendant may only be convicted, if at all, of one crime to the murder of Amy Gibbins.

The defendant has been charged with the murder of Bryor Gibbins by two (2) alternative counts, Count 3 and Count 4. The defendant may only be convicted, if at all, of one crime to the murder of Bryor Gibbins.

(O.R.XVII 3195).

[13] The uniform jury instruction comments, however, state "[i]f the jury is charged and instructed on the basis of alternative felonies, separate verdict forms should be given in order to determine which felony was committed. See Comments to Instruction No. 4-93, OUJI-CR(2d) (Supp. 2012).

[14] "[T]his Court construes and interprets Oklahoma's Double Jeopardy Clause as providing the same protections offered by the federal clause." Kane v. State, 1996 OK CR 14, ¶ 6, n. 5, 915 P.2d 932, 934 n. 5.

[15] Blockburger v. United States, 284 U.S. 299 (1932).

[16] For example, Instruction No. 20 provided:

No person may be convicted of murder in the first (sic) unless both the fact of the death of the person allegedly killed and the fact that his or her death was caused by the conduct of another person are established as independent facts and beyond a reasonable doubt.

(O.R.XVII 3199).

Instruction Nos. 28 and 29 outlined the charges related to Amy and the charges related to Bryor. (O.R.XVII 3208-09).

[17] The elements in Count 4 were: 1) the death of a human (meaning Bryor); 2) the death occurred as a result of an act or event which happened in the defendant's commission of first degree murder; and 3) the elements of the crime of first degree murder that the defendant is alleged to have been in the commission of, namely the death of a human, the death was unlawful, the death was caused by the defendant, and the death occurred during the murder of Amy Gibbins. (O.R.XVII 3215)

[18] Had Posey been separately charged and convicted of raping Amy, the prohibition against double jeopardy would require us to vacate that rape conviction under the felony murder merger rule.

[19] Horn requires the propensity evidence to be proven by clear and convincing evidence. Perez, 2023 OK CR 1, ¶ 4, 525 P.3d at 48.

[20] The list was non-exhaustive and district courts are free to consider any other matter the court finds relevant. Horn, 2009 OK CR 7, ¶ 40, 204 P.3d at 786. The district court in Posey's case addressed the Horn factors and concluded the probative value of the propensity evidence was not outweighed by its prejudicial effect.

[21] Instruction 9-10A provides:

You have heard evidence that the defendant may have committed another/other offenses(s) of (sexual assault)/(child molestation) in addition to the offense(s) for which he/she is now on trial. You may consider this evidence for its bearing on any matter to which it is relevant along with all of the other evidence and give this evidence the weight, if any, you deem appropriate in reaching your verdict. You may not, however, convict the defendant solely because you believe he/she committed this/these other offense(s) or solely because you believe he/she has a tendency to engage in acts of (sexual assault)/(child molestation). The prosecution's burden of proof to establish the defendant's guilt beyond a reasonable doubt remains as to each and every element of each/the offense charged.

[22] The Court stated:

Even if we agreed with [Dowling] that the lower burden of proof at the second proceeding does not serve to avoid the collateral-estoppel component of the Double Jeopardy Clause, we agree with the Government that the challenged evidence was nevertheless admissible because Dowling did not demonstrate that his acquittal in his first trial represented a jury determination that he was not one of the men who entered [the homeowner's] home.

Id. 493 U.S. at 350.

[23] Posey concedes in his brief that "there is no record of the jury trial" and that "[w]e have no idea what evidence was presented."

[24] Posey told the investigator, however, that he believed the sexual encounter with the Asian female occurred in his apartment.

[25] Section 720 governs the arrest and detention of a material witness in a criminal proceeding. It expressly provides an exception for crime victims, namely "no person may be detained as a material witness to a crime who is a victim of such crime." 22 O.S.2011, § 720(A). The statute further establishes rights that the material witness enjoys at the time of his or her detention, such as the right to not be detained longer than 48 hours before being brought before a judge, the right to be informed of the identity of the detaining officer as a law enforcement officer, the right to be informed probable cause shows he or she is a material witness to a felony, and the right to be informed probable cause shows he or she would be unwilling to accept service. Through reference to 22 O.S.2011, § 719, the statute also specifies other rights the material witness enjoys, like the right to be kept separately from those accused of crimes, the right to counsel, the right to the witness fee for the time he or she is in custody, and the right to release upon entry of a "written undertaking."

[26] T.W.'s own recognizance bond stated that she acknowledged she was indebted to the State in the sum of $2,500.00 which would be void when she appeared in court at the prosecution's request.

[27] Posey challenges panelists: R.B., M.S., J.G., M.C., A.L., M.E., and R.W.

[28] R.W. rated her support for the death penalty at a 5.

[29] R.B. was in favor of the death penalty for murder and child abuse. M.S. supported the death penalty for arson-related deaths.

[30] The three options are: 1) Bryor died as a result of an act or event that happened in the commission of his own murder, which occurred during his mother's murder; 2) his death occurred as a result of an act or event that happened in the commission of his mother's murder, which occurred during her own murder; or 3) his death occurred as a result of an act or event that happened in the commission of an unidentified, uncharged murder, which occurred during his mother's murder. Posey states the first two options are legally invalid because "where felony murder is predicated on murder, the predicate must be murder of another person, a person other than the deceased in the felony murder." The third option fails for lack of evidentiary support.

[31] We observe that use of the uniform instruction template would have eliminated the confusion Posey believes exists in this case. It reads:

Second, the death occurred as a result of an act or event which happened in the defendant's commission of a murder of a person other than the deceased.

Instruction No. 4-64, OUJI-CR(2d) (Supp.2018) (emphasis added).

[32] Instruction 20 stated in relevant part:

In arriving at your determination as to what sentence is appropriate under the law, you are authorized to consider only the evidence received here in open court presented by the State and the defendant during the sentencing phase of this proceeding.

(O.R.XVII at 3276; Instruction No. 4-82, OUJI-CR(2d).

[33] According to Posey, jurors may believe many circumstances that were not specifically addressed in court may warrant a sentence less than death, such as a disproportionate number of people of color face execution, especially where the victim is white, or that a disproportionate number of mentally ill defendants are executed or that convicted citizens are exonerated after spending years on death row.

[34] Ring v. Arizona, 536 U.S. 584 (2002) (holding any fact rendering a defendant eligible for the death penalty must be proven beyond a reasonable doubt).

[35] Instruction No. 16 stated:

Mitigating circumstances are 1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.

While all twelve jurors must unanimously agree that the State has established beyond a reasonable doubt the existence of at least one aggravating circumstance prior to consideration of the death penalty, unanimous agreement of jurors concerning mitigating circumstances is not required. In addition, mitigating circumstances do not have to be proved beyond a reasonable doubt in order for you to consider them.

(O.R.XVII at 3271; Instruction No. 4-78, OUJI-CR(2d) (Supp.2008).

[36] Posey's requested instruction read:

The State has alleged that "during the commission of the murder, the defendant knowingly created great risk of death to more than one person." This aggravating circumstance is not established unless the State proves beyond a reasonable doubt:

First, there was a risk of death;

Second, that risk must be to more than one person; and

Third, that the defendant must know that great risk of death to another person exists.

The fact that more than one person dies is not sufficient proof of this aggravating circumstance. The State must prove beyond a reasonable doubt that defendant's actions created a great risk of death to another person who was in close proximity, in terms of time, location and the intent of the act of the killing itself. The State must also prove that there was an actual risk to the bystander rather than just possible risk and that the risk of death to another person was more than a mere possibility.

Court's Exhibit 14 (footnotes omitted).

[37] He also claims the evidence failed to show he knew Bryor was present in the house and thus insufficient to prove that at the time of the fire he intended to create a great risk of death to anyone.

[38] In the Special Bill of Particulars, Amended Special Bill of Particulars, and Second Amended Special Bill of Particulars, the State's notice of the great risk of death to more than one person aggravator with respect to Bryor's murder read:

On June 16, 2013, the defendant murdered Amy Gibbins by means of striking her head with great force and violence and then he murdered Amy Gibbins' five year old son Bryor Gibbins, whose death was caused by smoke inhalation and thermal burns. The murders of Amy Gibbins and Bryor Gibbins were committed in close proximity of time and inside the house in Calumet, Oklahoma, where both Amy Gibbins and Bryor Gibbins resided.

The defendant also created a risk of death to more than one person by willfully and maliciously causing to burn the house where both Amy Gibbins and Bryor Gibbins resided after Amy Gibbins was murdered and while the house was occupied only by Bryor Gibbins; thereby creating a risk of death to Bryor Gibbins and others near the house.

(O.R.III at 405-06; O.R. XI at 2105; O.R.XIV at 2710-11).

[39] The Special Bill of Particulars and amended versions gave notice the State would support its continuing threat allegation with:

[a]ll evidence relating to the nature and circumstances of the murders of Amy Gibbins and her five year old son Bryor Gibbins, which demonstrates the brutal and callous actions of the defendant, including that the defendant brutally murdered Amy Gibbins by striking her head with great force and violence and penetrated her vagina with his penis. The defendant then took deliberate measures to conceal and destroy the evidence of his acts of violence by causing to burn the bodies of Amy Gibbins and Bryor Gibbins and the house where they both lived.

(O.R.III at 403, 406-07; O.R. XI at 2102, 2106; O.R.XIV at 2707-08, 2712).

[40] The jury heard from multiple witnesses about his mother's abuse and neglect including from Anna Marie Stockley, a former worker and supervisor for the Office of Juvenile Affairs (OJA), Robert Rolen, a former officer with the Tulsa Police Department, Carolyn Dubie, Posey's third grade teacher, Keeper Johnson, Jr., another former OJA worker, Rita Posey, Posey's aunt, Darius Posey, Posey's cousin and Erick Posey, Posey's twin brother who offered a firsthand account of his childhood and the cruel treatment he and his brother endured. Trial counsel also presented Posey's mother, Vanita Posey, who mostly denied being abusive but was declared a hostile witness upon trial counsel's request. The defense also presented many witnesses to attest to Posey's character as a friend, confidant, role model, inmate, and to his valued presence in their lives, including Randy Wood, David "Bo" Posey, Steven Wingfield, Katee Bruns, William "Bill" Griffis, Gilbert Thomas, Anna Templin, Philip Schrepel, Guy Johnson, Ramona Johnson, Carma Jones, Kathryn Klein-Fehrenbach, Joshua "Tiger" McIntosh, Kimberly McIntosh, Charles Tanner, Garrett Tanner, Kendra Gladson, Brian O'Leary, and Meghan Parks.

[41] Dr. Minagawa did not interview Posey personally or personally interview any mitigation witnesses. Instead, he reviewed Posey's school, DHS, juvenile, and health records, police reports, interview materials of family members and friends, and trial transcripts of the proceeding. For this reason, jurors may have viewed his testimony with a degree of skepticism.

[42] Posey has tendered for filing a motion to supplement his motion for new trial with a recording of the interviews conducted in the follow-up investigation as well as transcriptions of those interviews as an aid to the Court. Because his motion for new trial must be dismissed, we find his motion to supplement, tendered for filing on November 2, 2022, is procedurally moot. The Clerk of this Court is directed to file the motion to supplement to preserve it.

 

 

LUMPKIN, JUDGE, CONCURRING IN RESULT:

¶1 I concur in the results in this case. However, I write separately to discuss three points. In addressing Proposition I, the opinion attempts to restructure our plain error analysis, rather than repeating it as set forth in our cases. In Simpson v. State, 1994 OK CR 40, ¶¶ 2, 11, 23, 30, 876 P.2d 690, 694-95, 698-701, we held that in order to be entitled to relief, a defendant must show an actual error, which is plain or obvious, and which affects his or her substantial rights. This Court will only correct plain error if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice. Id., 1994 OK CR 40, ¶ 30, 876 P.2d at 701. See also Hogan v. State, 2006 OK CR 19, ¶38, 139 P.3d 907, 923 (citing Simpson). To ensure there is no misunderstanding regarding the application of plain error review and what a defendant must show to obtain relief for a finding of plain error, it is important to set out the analysis as in Simpson and Hogan. This will advise defendants they bear the burden to establish plain error and that even if it is established, they may not be entitled to relief.

¶2 Also, in addressing Proposition I, the opinion discusses a case from West Virginia cited by the State. That case is not binding precedent for this Court. Although this Court may find its analysis helpful in deciding this case, it is not a holding of this Court. Any rule established by this analysis depends on the holding this Court sets out as the precedent to be followed in later cases.

¶3 Finally, in Proposition X, the opinion addresses the sufficiency of the evidence of the great risk of death to more than one person aggravator. The opinion parses the facts in a micro-analysis without regard to the fact that both mother and child were alive when Appellant commenced his horrendous acts in raping and killing the mother. These acts instantaneously caused great risk of death to the child. Facts must be viewed in sequence and not in isolation. The great risk of death applied to more than one person when Appellant began his assault and murder. There is no need to break down the events into isolated sequences and cause an unrealistic abbreviation of the facts as they occurred.

 

 

 

 

 

 

 

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA